**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| IAN DAVIS,<br>aka Benson Davis, | ) | CASE NO.  1:14CV2854 |
| | ) | |
| Petitioner, | ) | JUDGE BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| MARGARET BRADSHAW, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

This 28 U.S.C. § 2254 petition is before the undersigned magistrate judge pursuant to Fed. R. Civ. P. 72(a) & (b), Local Rule 72.2(a), and 28 U.S.C. § 636(b)(1)(A) and (B).  (Doc. No. 31.)  Before the court is the petition of Ian Davis, also known as Benson Davis ("Davis" or "Petitioner"), for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  Petitioner is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the cases of *State of Ohio vs. Davis*, Case Nos. 91CR40924 and 93CR43666 (Lorain County September 22, 1994).  For the following reasons, the magistrate judge recommends that the petition be DENIED.

## I.  Introduction

The state appellate court that affirmed Davis' conviction noted the following facts:

On August 8, 1991, the body of Marsha Blakely was found in an alley behind the Westgate Plaza in Lorain.  Blakely appeared to be the victim of several different types of assaults.  She had numerous cuts and bruises on her body, her throat had been slashed, and she had been run over by a car.  The police investigation stalled until a reward was offered.  At this time, William Avery, Jr. came forward and made a statement to police that implicated Davis, among others, in the death of Blakely. Davis was

indicted for the assault and murder of Blakely.

* * *

Avery gave the following testimony at trial.  Davis and some of his associates from New York sold drugs in the Lorain housing projects.  Avery often purchased crack cocaine from these drug dealers.  On one occasion Avery was fronted some crack by Al Monday, the leader of the New York group.  Avery was to sell the crack and then pay Monday.  Avery, however, got behind in paying Monday back.  Avery then offered to "beat somebody up" to pay off his $3,000 to $4,000 drug debt to Monday.

On August 7, 1991, Monday attempted to take advantage of Avery's services.  Avery accompanied Monday to the apartment of Floyd Epps, where Blakely was staying.  Davis and three other men were waiting outside the apartment when Monday and Avery arrived.  Once all six men were inside the apartment, Monday asked Avery "to beat Marsha up."  Avery refused because he knew her too well.  As a result, Davis and the other men began beating Blakely themselves.  During the assault, a man known as Shakeme repeatedly asked Blakely, "Where's my shit at?" Avery assumed that he was referring to money or drugs.

Blakely tried to defend herself, and in the process she hit one of the men, Lenworth Edwards, in the face.  Edwards grabbed his nose, which was bleeding, and stepped away, but the other three kept on beating her until she was unconscious.  Davis then grabbed Blakely by the arm and dragged her, face down, to a car in the parking lot.  Edwards and two others got into the car with Blakely and Davis, while Avery and Monday got into a second car.  The two cars were driven to an alley behind Westgate Plaza, where a man known as Justice was waiting in a third car.  Blakely was dragged out of the car.  Justice began swinging a shiny object at Blakely.  Fearing for his life, Avery ran away.

Davis claims Avery's testimony is unreliable because of the circumstances surrounding his decision to testify about the assault and murder of Blakely.  A review of the record reveals that after a reward was offered, Avery's father originally approached the police with information concerning Blakely's murder.  The police, however, told him that they were looking for an eyewitness to the crime.  Avery then came forward as a witness.  Avery made a statement to the police, implicating Davis and his associates in the assault and murder of Blakely.  The police arrested Lenworth Edwards, who was later indicted for assault and aggravated murder.

On the day of Edward's trial, Avery stated that he was not going to testify unless he received $10,000.  The prosecutor would not agree to pay Avery any more money, so Avery refused to testify.  The trial court held

2

Avery in contempt, and ordered that he be incarcerated in the county jail until he agreed to testify.  Avery later returned to the courtroom, testified that he had lied to the police and recanted his testimony.  Avery claimed that he made everything up in order to collect the reward money.  As a result, the trial court granted Edwards' motion for a mistrial.

At Edward's second trial, Avery took the witness stand and explained that his original statements which implicated Edwards were in fact true.  He further explained that he had perjured himself during the first trial because he had been threatened by Edwards while in the county jail.  Avery proceeded to testify, describing in detail how Edwards had participated in the assault and murder of Blakely.  Edwards was convicted on both charges.  We affirmed the convictions in *State v. Edwards* (Dec. 16, 1992), Lorain App. Nos. 92CA005345 & 92CA005346.  The police used the information provided by Avery to identify and arrest Davis.

*State v. Davis*, 1996 WL 121998 at * 1-2 (Ohio App. 9th Dist. March 20, 1996).

## II.  Prior State and Federal Court Proceedings

### A.  Trial Court Proceedings

In September 1991, Davis was indicted by a Lorain County Court of Common Pleas Grand Jury on one count of felonious assault in violation of Ohio Rev. Code § 2903.11(A)(1) in connection with the August 1991 assault and murder of Marsha Blakely.  (Doc. No. 12-1, Exh. 1.)  Over a year later, in April 1993, Davis was indicted on one count of aggravated murder in violation of Ohio Rev. Code § 2903.01(A), also in connection with Ms. Blakely's death.[1]  (*Id.* at Exh. 2.)

Davis pled not guilty to both charges.  (*Id.* at Exhs. 3, 4.)  In September 1994, he entered a Notice of Intention to Claim Alibi, alleging that, at the time set forth in the indictments, he was in New York with his family.  (*Id.* at Exh. 5)

_____

[1] Davis' September 1991 indictment was in Lorain County Court of Common Pleas Case No.  91CR40924.  His April 1993 indictment was in Lorain County Court of Common Pleas Case No. 93CR43666.  (Doc. No. 12-1, Exhs. 1, 2.)

3

As noted above, Davis' conviction was based in large part on the testimony of William Avery, Jr. ("Avery"), who told police that he witnessed Davis and three other men (Alfred Cleveland aka "Al Monday," Lenworth Edwards, and John Edwards) assault Ms. Blakely at the apartment of Floyd Epps on the night of August 7, 1991.  (Doc. No. 12-6, Exh. 91.)  Avery also testified at the trials of Cleveland, Lenworth Edwards, and John Edwards.

Davis' case proceeded to jury trial on September 19, 1994.  (Doc. No. 12-6.) Witnesses included Avery, Lorain Police Detectives Richard Resendez and Geno Taliano, Lenworth Edwards, and Davis.  (*Id.*)  On September 22, 1994, a jury found Davis guilty as charged.  (Doc. 12-1, Exhs. 6,7.)  Following a sentencing hearing on September 22, 1994, the state trial court sentenced Davis to a term of 8 to 15 years incarceration on the felonious assault charge, to be served consecutive to a sentence of life in prison with parole eligibility after twenty (20) years on the aggravated murder charge.  (*Id.* at Exhs. 8-10.)

### B.    Direct Appeal

Davis, through new counsel, filed a direct appeal, in which he asserted the following assignments of error:

I.    THE EVIDENCE SUBMITTED AT TRIAL DOES NOT SUPPORT THE JUDGMENTS OF CONVICTION.

    A.    THE JUDGMENTS OF CONVICTION ARE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

    B.    THE JUDGMENTS OF CONVICTION OF FELONIOUS ASSAULT AND AGGRAVATED MURDER ARE CONTRARY TO LAW AND TO THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE

4

I, SECTION 16 OF THE OHIO CONSTITUTION, IN THAT THERE WAS INSUFFICIENT EVIDENCE PRESENTED TO ESTABLISH EACH AND EVERY ELEMENT OF THE OFFENSES BEYOND A REASONABLE DOUBT.

II.     APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHTS OF DUE PROCESS AND ASSISTANCE OF EFFECTIVE COUNSEL AS GUARANTEED TO HIM BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND BY SECTIONS 10 AND 16 OF ARTICLE I OF THE CONSTITUTION OF THE STATE OF OHIO.

A.     COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN FAILING TO OBJECT TO THE TESTIMONY OF THE PATHOLOGIST AND SEROLOGIST ON THE BASIS THAT THEIR TESTIMONY WAS NOT BASED ON FACTS IN EVIDENCE WHEN PRESENTED.

B.     COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN CALLING ALLEGED CO-DEFENDANT, LENWORTH EDWARDS, TO TESTIFY.

(Doc. No. 12-1, Exhs. 11, 12.)  Of particular relevance here, the basis of Davis' first

ground for relief was that "the only material witness [i.e., Avery] is wholly unreliable and .

. . no direct evidence links Appellant with the murder or assault of Marsha Blakely." (*Id.*

at Exh. 12, Page ID# 618.)  The State filed a brief in opposition on October 10, 1995.

(*Id.* at Exh. 13.)

The Court of Appeals for the Ninth District of Ohio ("state appellate court")

affirmed Davis' convictions and sentences on March 20, 1996.  With regard to Davis'

argument regarding Avery's reliability, the state appellate court found as follows:

Although Avery did change his story several times, he offered a plausible explanation for his inconsistencies.  The determination of the credibility of witnesses and the weight to be afforded their testimony is for the trier-of-fact. *State v. Tyler* (1990), 50 Ohio St.3d 24, 32.  Furthermore, the prosecution presented additional testimony which tends to corroborate Avery's account of what happened the evening Blakely was murdered.

5

The deputy coroner testified that Blakely died as a result of her throat being slashed.  He further testified that she also had a broken neck and damage to her chest cavity, and that these injuries were consistent with being run over by a car.  He noted that Blakely would have died from these wounds as well.  The autopsy also revealed scrapes and bruises on her head, which could have resulted from being dragged on the ground.

A witness [Delphenia Guice] testified that she knew Davis and indicated that he sold drugs along with the other members of the New York drug ring.  The witness further testified that [Lenworth] Edwards had asked her to say that he was with her on the night Blakely was murdered.  In addition, it was revealed that this witness turned over Lenworth Edwards' jean jacket, which had blood stains on it, to the police.

A serologist with the Ohio Bureau of Criminal Investigation testified that blood found on the jean jacket, which had been turned over to the police, could have come from [Lenworth] Edwards.  The serologist further testified that the blood had fallen straight down on the jacket.  Thus, the blood most likely came from a nose bleed.  A review of the evidence convinces this court that the jury verdict was not against the manifest weight of the evidence and was supported by legally sufficient evidence.  Accordingly, Davis' first assignment of error is overruled.

*Davis*, 1996 WL 121998 at * 3.

In April 1996, Davis, *pro se*, filed an appeal to the Ohio Supreme Court, raising

the following assignments of error:

I.      THE EVIDENCE SUBMITTED AT TRIAL DOES NOT SUPPORT THE JUDGMENTS OF CONVICTION.

        A.      THE JUDGMENTS OF CONVICTION ARE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

II.     THE DEFENDANT-APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHTS OF DUE PROCESS AND EFFECTIVE ASSISTANCE OF COUNSEL WHICH ARE GUARANTEED TO HIM BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND BY SECTIONS 10 AND 16 OF ARTICLE I OF THE OHIO STATE CONSTITUTION.

        A.      COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN FAILING TO OBJECT TO THE TESTIMONY OF THE

6

PATHOLOGIST AND OF THE SEROLOGIST ON THE
BASIS THAT THEIR TESTIMONY WAS NOT BASED ON
FACTS IN EVIDENCE WHEN PRESENTED.

(*Id.* at Exhs, 15, 16.)  The State filed a brief in opposition in May 1996.  (*Id.* at Exh. 17.)

On July 31, 1996, the Ohio Supreme Court denied leave to appeal and dismissed

the appeal as not involving any substantial constitutional question.  (*Id.* at Exh. 18.)

### C.    First Federal Habeas Petition

In January 1998, Davis filed his first federal habeas petition in this Court,

challenging his conviction and sentence for Ms. Blakely's assault and murder.  *See*

*Davis v. Wingard*, Case No. 1:98CV246 (N.D. Ohio) (Wells, J.)  Several months later, in

April 1998, Davis filed an Amended Petition.  (*Id.*)  District Judge Wells denied the

petition as time-barred by the Antiterrorism and Effective Death Penalty Act's ("AEDPA")

one-year statute of limitations.[2]  (*Id.* at Doc. No. 18.)  Upon Davis' appeal, the Sixth

Circuit declined to issue a Certificate of Appealability ("COA").  (*Id.* at Doc. No. 26.)

### D.    First Motion for New Trial

Meanwhile, in February 1998, Davis filed a *pro se* motion for new trial

in the state trial court on the basis of newly discovered evidence and prosecutorial

---

[2] Respondent does not attach Davis' petition or Judge Wells' decision as exhibits
to the Return.  As these filings pre-date ECF, copies are not readily available.
Moreover, Judge Wells' decision does not appear to be available on Westlaw.
Respondent should have obtained copies of these documents and submitted them as a
convenience to this Court.  As Petitioner does not take issue with this aspect of
Respondent's procedural history and its veracity is not in dispute, the Court will accept
these representations and proceed with its analysis of the instant habeas petition.

7

misconduct.  (Doc. No. 12-1,Exh. 19.)  Davis asserted the following arguments:

1.   "The prosecution withheld Mr. Jeremiah A. Charlton, also known as Smiley, statements and information that could have helped my defence [sic.]"

2.   "The prosecution mislead [sic] the jury by telling them that William Avery was a witness when, in fact, he was not.  Mr. Avery is a paid informant working for various law officials."

(*Id.* at PageID# 786.)

The evidence supporting Davis' motion included an affidavit from Jeremiah Abdullah (aka Jeremiah Charlton aka "Smiley") dated June 27, 1996.[3]  (*Id.* at Exh. 19, Page ID#s 793-808.)  Abdullah averred that, on the night of August 7, 1991, he saw Blakely get into a vehicle with two Hispanic men with the intent of exchanging sex for drugs.  (*Id.*)  Abdullah stated he provided this information to the police and prosecutor and, further, told them that he believed the unidentified Hispanic men were responsible for Blakely's death.  (*Id.*)  Abdullah further averred that he encountered Avery in the Lorain County Jail in December 1991 and spoke to him about the Blakely murder.  (*Id.*)  Abdullah claims Avery admitted he had lied about witnessing Blakely's assault in order to obtain the reward money and avoid serving time on drug charges.[4]  (*Id.*)  Davis

_____

[3] The Appendix to Davis' motion for new trial lists two exhibits: (1) the Affidavit of Jeremiah Abdullah; and (2) "Supplemental Discovery Provided for Co-Def. Of Benson Davis by Prosecutor Gregory A. White Containing (Secret Service Report on William Avery, Confidential Informant)."  (Doc. No. 12-1, Exh. 19 at Page ID# 792.)  The latter of these exhibits, however, is not included as an exhibit in the copy of Davis' motion attached to the Return as Exhibit 19.

[4] Abdullah avers, at some length, about his alleged conversation with Avery while both were being held in the Lorain County Jail.  (Doc. No. 12-1 at Exh. 19, Page ID#s 793-234.)  He claims he discouraged Avery from testifying against the "New York boys" (i.e., Davis, Cleveland, Lenworth Edwards, and John Edwards).  (*Id.*)  Abdullah claims Avery listened to Abdullah's advice and refused to testify (presumably, at Lenworth

claimed the prosecution improperly withheld Abdullah's statement during his (Davis')

underlying criminal proceedings.  (Doc. No. 12-1 at Exh. 19.)

The State filed a brief in opposition, in which it argued (among other things) that

Davis was not entitled to a new trial based on the Abdullah affidavit because "Charlton

[aka Abdullah] was called to the stand in John Austin Edwards' trial" and "[t]he State of

Ohio was in possession of a taped statement of Charlton which absolutely contradicted

his affidavit."  (*Id.* at Exh. 21.)

On February 18, 1998, the state trial court denied Davis' motion as untimely filed.

(*Id.* at Exh. 20.)

On March 11, 1998, Davis filed a timely *pro se* notice of appeal.  (*Id.* at Exh. 22.)

In his appellate brief, he raised the following three assignments of error:

> I.  TRIAL JUDGE JANIS WAS IN GROSS ABUSE OF DISCRETION WHEN HE DENIED DEFENDANT'S MOTION FOR NEW TRIAL BASED ON 120 DAY TIME-LIMIT AND BENSON DAVIS ONLY FOUND OUT NEW EVIDENCE AFTER MORE THAN THREE (3) YEARS BY AFFIDAVITS.
>
> II.  NEW EVIDENCE WAS NOT MERELY CUMULATIVE TO FORMER EVIDENCE AND MORE THAN IMPEACHMENT OR CONTRARY TO FORMER EVIDENCE.
>
> III.  DUE PROCESS OF LAW VIOLATED U.S. CONST. AND OHIO ST. CONST. ART. I 10 AND 16. . . IF THE COURT'S LOOK AT CRIM. R. 33(B) MOTION FOR NEW TRIAL, FROM TIME APPLICATION IF IT IS MADE APPEAR BY CLEAR AND CONVINCING PROOF THAT THE DEFENDANT'S WAS UNAVOIDABLY PREVENTED FROM THE DISCOVERY OF THE EVIDENCE UPON WHICH HE MUST RELY.

---

Edwards' trial.)  (*Id.*)  He further asserts Avery "told the Court & Prosecutor that he wasn't going to commit perjury because he lied about everything concerning the New York boys involvement in Blakely & Epps's murders."  (*Id.*)

(Doc. No. 12-2, Exh. 23.)[5]

On March 31, 1999, the state appellate court issued an Opinion, affirming the denial of Davis' motion for new trial.  (Doc. No. 12-2, Exh. 24.)  In relevant part, the appellate court determined as follows:

> We find that the trial court did not abuse its discretion by denying Davis' motion.  The jury's verdict was rendered on September 22, 1994.  In order for the motion to be timely, Davis should have filed his motion for a new trial, at the latest, by January 20, 1995.  He did not file his motion until February 11, 1998.  In his motion, Davis made no attempt to show the trial court why he was unavoidably prevented from discovering the evidence before January 20, 1995.  Because Davis failed to show by clear and convincing proof that he could not have presented the new evidence outside of the time limits set by Crim. R. 33(B), the trial court did not abuse its discretion by denying his motion for a new trial.

(*Id.* at Page ID# 907.)  *See also State v. Davis*, 1999 WL 194473 at * 1 (Ohio App. 9th Dist. March 31, 1999).

In April 1999, Davis filed a *pro se* notice of appeal with the Ohio Supreme Court. (Doc. No. 12-2, Exh. 25.)  In his memorandum in support of jurisdiction, he raised the following two assignments of error:

---

[5] Davis attached the Abdullah/Charlton affidavit to his appellate brief, along with a letter dated December 20, 1996 from Secret Service Special Agent Robert Wyche to Lorain County prosecuting attorney Jonathan Rosenbaum.  (Doc. No. 12-2, Exh. 23 at Page #ID 902-904.)  In this letter, Agent Wyche explains that an individual named "William Avery McArthur" had been acting as a confidential informant in connection with an investigation involving retail grocery stores in Lorain that were purchasing food stamp coupons for cash.  After providing information regarding the investigation and William Avery McArthur's role in it, Agent Wyche advised that the Secret Service had initiated an investigation regarding the possibility that "McArthur" had compromised the food stamp investigation.  The letter stated that "it is possible that obstruction charges will be filed against McArthur in the future."  (*Id.* at Page ID# 904.)  It appears this letter (the "Wyche letter" ) was provided by the State to John Edwards in discovery in connection with Edwards' criminal proceedings.  (Doc. No. 12-2, Exh. 26 at Page ID# 945-948.)

     I.     THE TRIAL COURT ERRED IN DENYING APPELLANT['S] MOTION FOR NEW TRIAL WHERE THE MISCONDUCT OF THE PROSECUTING ATTORNEY MATERIAL IS PREJUDICIALLY INTERFERED WITH APPELLANT FUNDAMENTAL RIGHT TO A FAIR AND IMPARTIAL TRIAL AS MANDATED BY THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I SECTIONS 5 AND 16 OF THE OHIO CONSTITUTION.  PROSECUTOR MISCONDUCT, WITHHOLDING EVIDENCE FAVORABLE TO MR. DAVIS RESULTED IN PREJUDICING HIM.

     II.     TRIAL JUDGE JANIS WAS IN GROSS ABUSE OF DISCRETION WHEN HE DENIED DEFENDANT'S MOTION FOR NEW TRIAL BASED ON 120 DAY TIME-LIMIT AND BENSON DAVIS ONLY FOUND OUT NEW EVIDENCE AFTER MORE THAN THREE (3) YEARS BY AFFIDAVITS.

(Doc. No. 12-2, Exh. 26.)  The State filed a memorandum in opposition on May 20, 1999.  (*Id.* at Exh. 27.)

In June 1999, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  (*Id.* at Exh. 28.)

### D.    Post-Conviction Petitions

In March 1998, Davis filed a *pro se* petition for post-conviction relief in state trial court, raising the same grounds raised in his motion for new trial.  (Doc. No. 12-2, Exh. 29.)  The trial court denied Davis' petition as follows:

Defendant's petition for post-conviction relief is denied.  Said petition, filed March 10, 1998, is untimely filed.  Said petition is barred by *res judicata* as all claims set forth in said petition were or could have been raised on direct appeal or were or could have been raised in defendant's motion for new trial.

(*Id.* at Exh. 30.)  It does not appear that Davis appealed from this judgment.

Over a year later, in November 1999, Davis filed a second *pro se* post-conviction petition, this time arguing the trial court erred in sentencing him without having first

ordered a pre-sentence investigation report.  (*Id.* at Exh. 31.)  The trial court denied

Davis' petition on December 6, 1999 on the basis it was barred by *res judicata* and

meritless.  (*Id.* at Exh. 32.)

On January 7, 2000, Davis filed a *pro se* notice of appeal with the state appellate

court, asserting the trial court erred in dismissing his post-conviction petition without a

hearing.[6]  (*Id.* at Exh. 33.)  The State filed a brief in opposition, to which Davis replied.

(*Id.* at Exhs. 34, 35.)

In March 2000, the state appellate court dismissed Davis' appeal for failure to

comply with the court's local rule regarding indigency procedures.  (*Id.* at Exh. 36.)

Davis thereafter filed a "Motion for Relief from Judgment or Order Under Grounds of

Excusable Neglect," claiming he "is a layman at law and is functionally illiterate and

must depend on an inmate paralegal to define certain legal jargon."  (*Id.* at Exh. 37.)

The state appellate court construed Davis' motion as a motion for reconsideration and

denied it on April 6, 2000.  (*Id.* at Exh. 38.)

Subsequently, on November 2, 2001, Davis filed a *pro se* "Motion to Correct

Judgment of Sentence" in the state trial court, again complaining the trial court erred in

failing to consider a pre-sentence investigation report prior to sentencing.  (*Id.* at Exh.

39.)  The trial court denied Davis' motion on November 14, 2001.  (*Id.* at Exh. 40.)

Davis then appealed, raising the following grounds for relief:

I.      THE TRIAL COURT COMMIT REVERSIBLE ERROR TO THE
        PREJUDICE OF DEFENDANT-APPELLANT, WHEN THE TRIAL
        COURT SENTENCED DEFENDANT-APPELLANT WITHOUT THE

---

[6] Respondent does not include Davis' appellate brief in the habeas record, noting
that it "is missing from the court's file."  (Doc. No. 12 at 7, fn 4.)

> ORDERING OF A PRE-SENTENCE INVESTIGATION REPORT, THUS VIOLATES DEFENDANT-APPELLANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS.
>
> II.     THE DEFENDANT-APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AND HIS DUE PROCESS RIGHTS WERE VIOLATED, WHEN TRIAL COUNSEL FAIL TO PROTECT HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS AT SENTENCING.

(*Id.* at Exhs. 41, 42.)

On December 13, 2001, the state appellate court ordered Davis to comply with certain local rules, warning his appeal would be dismissed if he failed to do so.  (*Id.* at Exh. 43.)  On January 9, 2002, the court dismissed Davis' appeal for failure to comply with the December 13, 2001 Order.  (*Id.* at Exh. 44.)  Davis later filed a motion for reconsideration, which was denied.  (*Id.* at Exhs. 45, 46.)

### E.     First Successive Federal Habeas Corpus Application

In August 2002, Davis filed an application in the Sixth Circuit Court of Appeals to file a successive habeas petition.[7]  (Doc. No. 12-3, Exh. 66 at Page ID# 1341.)  In that application, he argued the evidence did not support his convictions, his attorney was ineffective, and the trial court abused its discretion in denying a previous motion for new trial.  (*Id.* at Exh. 66 at Page ID#1345-1346.)  The Sixth Circuit denied this application for "failing to satisfy the requirements of" § 2244(b)(2).  (*Id.*)  See also Doc. No. 12-2 at Exh. 47.

### F.     Motion for Resentencing Hearing

---

[7] Davis' application references a supporting memorandum; however, that memorandum does not appear to be included in the habeas record before this Court.

13

In November 2009, Davis filed a *pro se* "Motion for Reconsideration of Sentence," arguing his sentence failed to comply with Ohio Crim. R. 32(C) because the entry failed to indicate that the finding of guilt was by a jury.  (*Id.* at Exh. 48.)  The State filed a response, acknowledging that "a violation of Crim. R. 32 exists, however, the defendant's remedy is this court issuing corrected sentencing entries."  (*Id.* at Exh. 49.) The trial court granted Davis' motion to the extent that the court issued a *nunc pro tunc* entry on January 12, 2010 setting forth that Davis was found guilty by a jury.  (*Id.* at Exh. 50.)

Davis failed to timely appeal and, instead, filed two motions for delayed appeal, the first on September 16, 2010 and the second on September 29, 2010.  (*Id.* at Exhs. 51, 52.)  In orders filed December 27, 2010, the state appellate court dismissed Davis' appeals for failure to comply with that court's local rules.  (Doc. No. 12-3, Exhs. 53, 54.) It does not appear that Davis appealed from these judgments.

### G.      Motion for Leave to file Delayed Motion for New Trial

In June 2012, Davis filed a *pro se* motion in the state trial court for leave to file a delayed motion for new trial, claiming newly discovered evidence.  (Doc. No. 12-3, Exh. 55.)  In support of his motion, Davis attached the following "newly discovered evidence:" (1) his own affidavit claiming innocence; (2) a copy of AT&T long distance phone records from New York to Lorain, Ohio dated June 27th to August 10th, that he claimed demonstrated he was in New York on the night of the murder; (3) a copy of a Lorain County Jail investigative report dated December 23, 1991 ("Jail Investigative Report") regarding Avery's allegation that a corrections officer allowed Lenworth Edwards to threaten him (Avery) in jail; and (4) Avery's 2006 affidavit recanting his former testimony

14

that he witnessed Ms. Blakeley's assault and murder.  (*Id.*)  Davis claimed he was

unaware of, and had not received copies of, either the Jail Investigative Report or

Avery's 2006 Affidavit until November 2011, when he obtained them from Cleveland.

(*Id.*)

On June 21, 2012, the trial court summarily denied Davis' motion for leave to file

a delayed motion for new trial.  (*Id.* at Exh. 56.)

In July 2012, Davis appealed, raising the following assignments of error:

I.    THE TRIAL COURT VIOLATED APPELLANT'S FIFTH, SIXTH,
      AND FOURTEENTH AMENDMENT DUE PROCESS RIGHT[S]
      WHEN IT DENIED THE APPELLANT'S MOTION FOR LEAVE TO
      FILE DELAYED MOTION FOR NEW TRIAL WITHOUT
      DETERMINING WHETHER APPELLANT WAS UNAVOIDABLY
      PREVENTED FROM DISCOVERING THE EVIDENCE WITHIN
      120 DAYS OF THE JURY VERDICT AS MANDATED PURSUANT
      TO CRIM. R. 33(B) DUE TO THE FOLLOWING REASONS:

      A.    THE PROSECUTING ATTORNEY INTENTIONALLY
            WITHHELD AND/OR SUPPRESSED THE EVIDENCE OF
            THE INTERNAL INVESTIGATION INTO THE
            ALLEGATIONS MADE BY THE STATE WITNESS, WILLIAM
            AVERY JR., THAT HE WAS THREATENED WHILE BEING
            HELD IN THE COUNTY JAIL NOT TO TESTIFY;

      B.    THE TRIAL COUNSEL INTENTIONALLY WITHHELD
            AND/OR SUPPRESSED THE EVIDENCE OF THE AT&T
            PHONE RECORDS THAT WOULD HAVE SUPPORTED
            TRIAL WITNESS TESTIMONY THAT APPELLANT MADE
            SEVERAL CALLS FROM NEW YORK TO OHIO BEFORE,
            ON, AND AFTER THE DAY THE VICTIM WAS
            MURDERED, THEREBY PROVING THAT HE WAS NOT IN
            OHIO ON THE DAY OF THE MURDER.

II.   APPELLANT WAS DENIED A FAIR TRIAL WHERE THE
      PROSECUT[OR] INTENTIONALLY SUPPRESSED
      EXCULPATORY EVIDENCE FAVORABLE TO THE DEFENSE
      VIOLATING THE HOLDING SET FORTH IN *SMITH V. CAIN*, 132
      S.CT. 627, DECIDED JAN. 10, 2012.

III.     APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHERE TRIAL COUNSEL INTENTIONALLY SUPPRESSED AND/OR WITHHELD EVIDENCE PROVING THAT APPELLANT WAS IN NEW YORK ON THE DAY THAT THE VICTIM WAS MURDERED.

IV.     APPELLANT IS ENTITLED TO A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE RELATING TO A SWORN AFFIDAVIT FROM THE STATE PROSECUTOR'S WITNESS ATTESTING TO THE FACT THAT HIS TESTIMONY WAS FALSE AND THAT HE INTENTIONALLY LIED ON THE APPELLANT, AND THAT HE NEVER WITNESSES THE MURDER OF THE VICTIM, NOR DID HE EVER WITNESS APPELLANT COMMIT ASSAULT AGAINST THE VICTIM.

(Doc. No. 12-3, Exhs. 57, 58.)  The State filed a brief in opposition.  (*Id.* at Exh.

59.)

Several months later, in December 2012, Davis requested that the state

appellate court take judicial notice of the Sixth Circuit's 2012 decision in *Cleveland v.*

*Bradshaw*, 693 F.3d 626 (6th Cir. 2012).[8]  (*Id.* at Exh. 60.)

_____

[8] Cleveland filed a habeas petition in this Court in January 2010, challenging his conviction and sentence for Blakely's death.  *See Cleveland v. Bradshaw*, Case No. 1:10CV148 (N.D. Ohio)(Zouhary, J.)  The magistrate judge issued a Report & Recommendation that Cleveland's claims be dismissed as time-barred by AEDPA's one-year statute of limitations, which District Judge Zouhary adopted on January 14, 2011.  (*Id.* at Doc. Nos. 15, 20.)  The Sixth Circuit subsequently reversed, finding Cleveland presented a credible claim of actual innocence, entitling him to equitable tolling, and remanded the case to the district court for consideration of the merits of Cleveland's Petition.  *See Cleveland v. Bradshaw*, 693 F.3d 626 (6th Cir. 2012).  In his appeal from the denial of his motion for leave to file delayed motion for new trial, Davis asked the state appellate court to take judicial notice of this 2012 Sixth Circuit decision  Subsequently, Judge Zouhary held a full-day evidentiary hearing on remand in the *Cleveland* case on December 17, 2013, during which both Cleveland and Respondent presented evidence.  *See Cleveland*, Case No. 1:10CV148 (Doc. No. 108 at p. 2.) On December 12, 2014, Judge Zouhary issued an Opinion, in which he determined Cleveland's claims lacked merit, denied the § 2254 petition, and denied Cleveland a Certificate of Appealability ("COA").  (*Id.* at Doc. No. 108.)  Cleveland timely appealed.  On February 24, 2016, the Sixth Circuit denied Cleveland's application for a COA.  *See Cleveland v. Bradshaw*, Case No. 15-3029 (6th Cir.  Feb. 24, 2016).

On March 11, 2013, the state appellate court affirmed the trial court's denial of Davis' motion for leave to file delayed motion for new trial, on the grounds Davis "had failed to show by clear and convincing evidence that he filed his motion 'within a reasonable time after obtaining the newly discovered evidence.'" *State v. Davis*, 2013 WL 936241 (Ohio App. 9th Dist. March 11, 2013).

Davis filed a *pro se* appeal in the Ohio Supreme Court, raising the following propositions of law:

> I.     APPELLANT WAS DENIED A FAIR TRIAL WHERE THE PROSECUTOR INTENTIONALLY SUPPRESSED EXCULPATORY EVIDENCE FAVORABLE TO THE DEFENSE.
>
> II.    APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHERE COUNSEL INTENTIONALLY SUPPRESSED EXCULPATORY EVIDENCE FAVORABLE TO THE DEFENSE.
>
> III.   APPELLANT WAS DENIED HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR HEARING WHERE THE COURT FAILED TO DETERMINE IF THE NEW EVIDENCE DEMONSTRATED ACTUAL AND FACTUAL INNOCENCE AND RAISED SUFFICIENT DOUBT AS TO THE QUESTION OF GUILT TO UNDERMINE CONFIDENCE IN THE VERDICT.
>
> IV.    APPELLANT WAS DENIED THE FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR HEARING WHERE THE COURT REFUSED TO APPLY THE RULING IN CLEVELAND V. BRADSHAW, 693 F.3D 626 REGARDING THE SWORN AFFIDAVIT OF WILLIAM AVERY JR.

(Doc. No. 12-3 at Exhs. 62, 63.)  The State filed a brief in opposition.  (*Id.* at Exh. 64.)

On June 26, 2013, the Ohio Supreme Court declined to accept jurisdiction pursuant to S.Ct. Prac. R. 7.08(B)(4).  (*Id.* at Exh. 65.)

**H.     Second Successive Habeas Application**

17

On August 22, 2013, Davis filed an application in the Sixth Circuit Court of Appeals to file a successive habeas petition based on the same evidence he presented to the state courts.  (*Id.* at Exh. 66.)  In an Order filed May 5, 2014, the Sixth Circuit determined as follows:

> To the extent that Davis relies on the phone bill purportedly showing that he made a phone call from New York around the time of the murder, he has failed to demonstrate reliance on new facts that could not have been discovered previously.  *See* 28 U.S.C. § 2244(b)(2)(B)(i).  Even at the time of trial, Davis was aware that the phone bill existed and was in his attorney's possession.  Davis could have raised an ineffective assistance of counsel claim based on this evidence in his first habeas petition.  As to his claims stemming from Avery's alleged perjury, however, Davis has made the required prima facie showing.  If it were proven that Avery fabricated his testimony, that he was pressured by the prosecution to testify falsely at trial, and that the prosecution withheld evidence casting further doubt on Avery's credibility, Davis could establish that a constitutional violation occurred and that, absent this violation, no reasonable factfinder would have found him guilty.  *See In re McDonald*, 514 F.3d 539, 545-547 (6th Cir. 2008).

*In re: Ian R. Davis, aka Benson Davis*, Case No. 13-3981 (6th Cir. May 5, 2014).

Accordingly, the Sixth Circuit granted Davis' motion for authorization to file a second or successive habeas petition and transferred the case to this Court based on Davis' claims stemming from Avery's alleged perjury.  (*Id.*)

### III.  Proceedings in this Court

On November 19, 2014, Petitioner, through counsel, filed the instant successive § 2254 petition.  (Doc. No. 1.)  He asserts the following seven grounds for relief:

I.     The state presented testimony at Mr. Davis' trial that it knew or should have known was false, in violation of Mr. Davis' due process rights.  U.S. Const. Amend. XIV; *Napue v. Illinois*, 360 U.S. 264 (1959); *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

II.    The state violated Mr. Davis' due process rights when it failed to

18

disclose evidence that impeaches the sole witness linking Mr. Davis to the murder, William Avery, Jr. U.S. Const. Amends. V, XIV; *Napue v. Illinois*, 360 U.S. 264 (1959); *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972).

III.     The state violated Mr. Davis' due process rights when it failed to disclose favorable evidence, specifically the statement of Jeremiah Abdullah. U.S. Const. Amends. V, XIV; *Brady v. Maryland*, 373 U.S. 83 (1963).

IV.     The state violated Mr. Davis' due process rights when it failed to disclose exculpatory evidence, the cumulative effect of which would have produced a difference result in Mr. Davis' trial. U.S. Const. Amends. V, XIV; *Brady v. Maryland*, 373 U.S. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419 (1994).

V.     Mr. Davis was denied the effective assistance of counsel, in violation of his rights under the United States Constitution, when counsel failed to present evidence corroborating Mr. Davis' innocence. U.S. Const. Amends. XI, XIV, *Strickland v. Washington*, 466 U.S. 668 (1984).

VI.     Mr. Davis' conviction is not supported by sufficient evidence, in violation of the United States Constitution. U.S. Const. Amend. XIV; *Jackson v. Virginia*, 443 U.S. 307 (1979).

VII.     Mr. Davis is actually innocent of Marsha Blakely's murder and felonious assault. His convictions violate the U.S. Constitution. U.S. Const. Amends. V, VII, XIV; *Herrera v. Collins*, 506 U.S. 390 (1993).

(Doc. No. 1). In addition to a lengthy memorandum in support, Davis attached twenty-two (22) exhibits to his Petition, comprising nearly three hundred pages of documents. (Doc. Nos. 1-2 through 1-23.) Davis did not state whether these exhibits were part of the state court record, or otherwise explain the source or origin of these documents; nor did he explain why they were properly before this Court in these habeas proceedings.

Davis' petition was assigned to District Judge Wells. On November 20, 2014, Respondent filed a Motion to Reassign (Doc. No. 3) the case to District Judge Zouhary,

on the grounds it was related to *Cleveland v. Bradshaw*, Case No. 1:10CV148 (N.D. Ohio) (Zouhary, J.)  Judge Wells denied the motion via non-document Order on January 8, 2015, and issued an Order referring the case to the undersigned magistrate judge for a report and recommended decision pursuant to Local Rule 72.2(b)(2).  (Doc. No. 7.) Respondent thereafter filed a Motion for Reconsideration (Doc. No. 9), that Judge Wells denied on January 26, 2015.

Respondent subsequently filed her Return on May 11, 2015.  (Doc. No. 12.) Respondent attached 105 exhibits to the Return, comprising over two thousand three hundred pages.  (Doc. Nos. 12-1 through 12-8.)  While it is clear that many of these exhibits are from the state court record in Davis' underlying criminal proceedings, there are numerous exhibits that do not appear to be part of Davis' state court record (i.e., Exhibits 84 through 90, 92-105.)  Respondent did not explain the source or origin of these documents; nor did she explain why they were properly before this Court in these habeas proceedings.

Davis filed his Traverse on August 10, 2015 (Doc. No. 17), to which Respondent replied on September 30, 2015 (Doc. No. 20.)

After Judge Wells' retirement, District Judge Boyko was randomly assigned to the instant case, on October 7, 2015.   Respondent promptly filed a "Motion for Reconsideration of Motion to Reassign Case," arguing again that the instant matter is related to *Cleveland v. Bradshaw*, Case No. 1:10CV148 (N.D. Ohio) (Zouhary, J.) and requesting the case be reassigned to Judge Zouhary.  (Doc. No. 21.)  Davis opposed the motion.  (Doc. No. 22.)  On January 14, 2016, Judge Boyko issued an Order denying the motion.  (Doc. No. 23.)

20

Thereafter, on February 24, 2016, Respondent filed a Notice, in which she advised the Court that the Sixth Circuit had issued an Order denying Cleveland a COA in his federal habeas proceedings.  (Doc. No. 24.)  *See Cleveland v. Bradshaw*, Case No. 15-3029 (6th Cir.  Feb. 24, 2016).  Respondent included several pages of argument regarding the implications of the Sixth Circuit's ruling on the instant matter.  (Doc. No. 24.)  Davis filed a Response on March 9, 2016.  (Doc. No. 25.)

On March 15, 2016, Davis filed a Motion for Leave to Conduct Discovery.  (Doc. No. 26.)  Davis requested leave to conduct the depositions of Avery, Lorain County prosecuting attorney Jonathan Rosenbaum, Lorain Police Detectives Geno Taliano and Richard Resendez, Lenworth Edwards, Lorain County Sheriff Newman, Jeremiah Abdullah, and Gwen Mincy.  (*Id.*)  He also sought leave to obtain complete copies of (1) all files concerning his own prosecution, as well as the prosecutions of Lenworth Edwards, Alfred Cleveland, and John Edwards, in the possession of the Lorain County Prosecutor's Office; (2) all files concerning the murders of Marsha Blakely and Floyd Epps in the possession of the Lorain County Police Department; and (3) all files pertaining to Avery and/or Lenworth Edwards in the possession of the Lorain County Sheriff's Office and Lorain County Correctional Facility.  (*Id.*)

In response, Respondent filed a "Motion to Expand the Record and Opposition to Petitioner's Motion for Additional Discovery."  (Doc. No. 27.)  Respondent argued the record in the instant case should be expanded to include the record from *Cleveland v. Bradshaw*, Case No. 1:10CV148 (N.D. Ohio) (Zouhary, J.).  (*Id.*)  She further argued Davis had failed to establish good cause for the discovery he now seeks.  (*Id.*)  Petitioner replied on March 30, 2016.  (Doc. No. 28.)

21

On May 19, 2016, the undersigned magistrate judge issued an Order (Doc. No. 29) (1) denying Davis' Motion for Leave to Conduct Discovery, and (2) granting Respondent's Motion to Expand the Record to the extent the record is expanded to include the transcript and exhibits of the evidentiary hearing conducted before Judge Zouhary in *Cleveland v. Bradshaw*, Case No. 1:10CV148 (N.D. Ohio).  The Court ordered Respondent to file, in these proceedings, full and complete copies of the evidentiary hearing and transcripts in the *Cleveland* case.  (Doc. No. 29 at 23.)  In addition, the Court ordered the parties to each submit an Index of Exhibits that clearly identified, for each exhibit attached to the Petition and Return respectively, whether said exhibit is located in the state court record and, if so, where.  (*Id.* at 22-23.)  To the extent the parties relied on evidence in briefing before this Court that was not part of the state court record in Davis' underlying criminal case or the newly expanded record, the parties were each ordered to submit a Notice to the Court identifying those instances where they relied on extra-record evidence in their briefing.  (*Id.*)

The next day, Davis filed a "Motion for Clarification and to Stay Enforcement of the Magistrate Judge's May 19, 2016 Order."   (Doc. No. 30.)  Davis suggested that this matter should not have been automatically referred to the undersigned magistrate judge pursuant to Local Rule 72.2(b)(2), and moved the Court "to clarify the reason this case was referred to the Magistrate Judge." (*Id.* at 2-3.)  In addition, Davis sought a stay of the undersigned's order that the parties provide an index and notice within seven (7) days of the May 19, 2016 Order, "in order to permit Davis to file an appeal to the Magistrate Judge's Order."   (*Id.* at 2.)

On May 23, 2016, Judge Boyko issued an Order clarifying that, although the

22

referral incorrectly cited Local Rule 72.2(b)(2), "the citation to Local Rule 72.2(b) was merely a clerical error where the proper authority for referral of both dispositive and non-dispositive matters is governed by Fed. R. Civ. P. 72(a) and (b) and Local Rule 72.2(a) pursuant to the authority granted Magistrate Judges under 28 U.S.C. § 636(b)(1)(A) and (B)."  (Doc. No. 31 at 2.)  Therefore, Judge Boyko corrected the referral order *nunc pro tunc* to refer the matter to the undersigned for "decision on non-dispositive matters pursuant to Fed. R. Civ. P. 72(a), Local Rule 72.2(a) and 28 U.S.C. § 636(b)(1)(A) and dispositive matters pursuant to Fed. R. Civ. P. 72(b), Local Rule 72.2(a) and 28 U.S.C. § 636(b)(1)(B)."  (*Id.* at 2-3.)

On May 24, 2016, the undersigned issued an Order denying Davis' motion for stay.  (Doc. No. 33.)  Respondent then moved for an extension of time to comply with the Court's May 19, 2016 Order regarding the filing of the *Cleveland* evidentiary hearing transcript and exhibits, as well as the Index of Exhibits and Notice.  (Doc. No. 32.)  The Court granted the motion in part and denied it in part, allowing the parties an additional five days to comply with the Court's Order.  (Doc. No. 34.)

On May 27, 2016, the parties complied with the Court's Order, each filing an Index of Exhibits and Notice identifying those instances where they relied on extra-record evidence in their briefing.  (Doc. Nos. 35, 36, 39.)  In addition, on that same date, Respondent filed the exhibits from the evidentiary hearing in *Cleveland v. Bradshaw*, Case No. 1:10CV148 (N.D. Ohio) and noted that the transcript had already been filed as an attachment to the Return.  (Doc. Nos. 37, 38.)

**IV.  Davis' Successive Petition:**
**Jurisdictional Requirements of 28 U.S.C. §2244(b)(2)**

23

Respondent first contends Davis' successive habeas petition should be dismissed pursuant to 28 U.S.C. §2244(b)(2) because his claims fail to satisfy the requirements for filing a second or successive petition.  For the following reasons, this Court agrees.

> 28 U.S.C. § 2244(b)(2) provides as follows:
>
> A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless --
>
> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Before a second or successive habeas petition is filed in a federal district court, a habeas petitioner is required to move in the appropriate court of appeals for an order authorizing the district court to consider the petition.  *See* 28 U.S.C. § 2244(b)(3)(A); *Stewart v. Martinez-Villareal*, 523 U.S. 637, 641 (1998).  Under the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), a federal district court does not have jurisdiction to entertain a successive post-conviction motion or petition for writ of habeas corpus in the absence of an order from the court of appeals authorizing the filing of such a successive motion or petition.  *See Holland v. Maclaren*, 2016 WL 795859 at * 4 (E.D. Mich.  Feb. 29, 2016) (citing *Ferrazza v. Tessmer*, 36 F.Supp.2d 965, 971 (E.D. Mich. 1999)).

In the present case, the Sixth Circuit granted Davis authorization to file a successive habeas petition "[a]s to his claims stemming from Avery's alleged perjury." *In re: Ian R. Davis, aka Benson Davis*, Case No. 13-3981 (6th Cir. May 5, 2014). However, the Sixth Circuit's Order, which allowed Davis to proceed with this second petition, was merely a determination by the Sixth Circuit that Davis had made a *prima facie* showing that the application satisfied the requirements of 28 U.S.C. § 2244.  *See Holland*, 2016 WL 795859 at * 5;  *Ferrazza*, 36 F. Supp. 2d at 973.  "'*Prima facie*' in this context means simply sufficient allegations of fact together with some documentation that would 'warrant a fuller exploration in the district court.'"  *In re Lott*, 366 F.3d 431, 433 (6th Cir. 2004)(internal quotation omitted).  *See also Keith v. Bobby*, 551 F.3d 555, 557 (6th Cir. 2009); *Durr v. Cordray*, 602 F.3d 731, 737 (6th Cir. 2010).  Such a "'*prima facie* showing'...is not a difficult standard to meet."  *Lott*, 366 F.3d at 432.

28 U.S.C. § 2244(b)(4) requires a district court to "dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section." *See In re McDonald*, 514 F.3d 539, 543 (6th Cir. 2008).  Therefore, even after a court of appeals has certified a successive petition on the basis that the movant has made a *prima facie* showing that the statutory standard of § 2244(b) has been satisfied, it is appropriate for a district court to dismiss the petition if the merits of the successive petition do not ultimately satisfy that same statutory standard under § 2244(b).  *See Tyler v. Cain*, 533 U.S. 656, 661, n. 3 (2001); *Keith*, 551 F.3d at 557; *Elliot v. Berghuis*, 2009 WL 3199856 at * 4-8 (E.D. Mich.  Sept. 29, 2009); *Morris v. Carlton*, 2006 WL 2639497 at * 5 (E.D. Tenn. Sept. 13, 2006); *Lott v. Bagley*, 2007 WL 2891272 at * 13

(N.D. Ohio Sept. 28, 2007) (O'Malley, J.)

Under this standard, Davis must satisfy a two-pronged test in order to be entitled to a review on the timeliness, procedural default or merits of his claims.  *See Lott,* 2007 WL 2891272 at * 13; *Morris,* 2006 WL 2639497 at * 5.  Under the first prong, Davis must show diligence; *i.e.,* that "the factual predicate for his claim could not have been discovered previously through the exercise of due diligence."  28 U.S.C. § 2244(b)(2)(B)(i).  *See also Lott,* 2007 WL 2891272 at * 13; *Morris,* 2006 WL 2639497 at * 5.  Under the second prong, Davis must show that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(2)(B)(ii).  *See also Lott,* 2007 WL 2891272 at * 13; *Morris,* 2006 WL 2639497 at * 5.  Davis must satisfy both prongs in order to satisfy §2244(b)(2)(B).

Respondent presents separate arguments regarding why each of Davis' claims fail to meet the statutory standard set forth in §2244(b)(2).  The Court will address each of these in turn.

### A.    Ground Three and Six

Ground Three of Davis' successive petition asserts a *Brady* claim based on the State's alleged failure to disclose the August 1991 recorded police interview of Jeremiah Abdullah.  (Doc. No. 1 at 66, ¶ 77.)  Ground Six asserts Davis' convictions are not supported by sufficient evidence.  (*Id.* at 87, ¶ 133.)

Respondent argues the Sixth Circuit did not authorize Davis to present either of these Grounds in this successive habeas application.  (Doc. No. 12 at 17.)  She

26

maintains §2242(b)(1) bars this Court's consideration of these claims because they were previously presented and dismissed in Davis' first habeas application, which was dismissed by District Judge Wells as untimely filed. (*Id.*) Respondent asserts that this dismissal (which was upheld when the Sixth Circuit denied Davis' application for a COA) constitutes a decision on the merits. Therefore, "under 28 U.S.C. § 2244(b)(1), these previously presented and denied grounds are expressly disallowed." (*Id.*)

Davis acknowledges he raised Grounds Three and Six in his first petition for writ of habeas corpus. (Doc. No. 17 at 58.) Nonetheless, Davis requests this Court "consider his third and sixth grounds for relief, as subsequent to his first petition, the United States Supreme Court recognized that (1) the AEDPA statute of limitations is subject to equitable tolling; and (2) actual innocence is an equitable exception to the statute of limitations." (*Id.*) For these propositions, he cites the Supreme Court's decisions in *Holland v. Florida*, 560 U.S. 631 (2010) and *McQuiggin v. Perkins*, 133 S.Ct. 1924 (2013), both of which were decided well after the dismissal of Davis' first habeas petition.

Davis argues that, following *Holland* and *Perkins*, "a number of courts which had previously dismissed petitions as untimely entertained arguments that a petitioner was entitled to equitable tolling." (*Id.* at 59.) Davis acknowledges these cases involved motions for relief from judgment under Fed. R. Civ. P. 60(b), rather than successive habeas petitions. He asks this Court to overlook this distinction, however, arguing that "though [he] raises his arguments in a petition for habeas corpus relief, rather than a 60(b) motion, not every subsequent petition, or in this case, argument, is to be considered 'second or successive' pursuant to 28 U.S.C. § 2244(b)." (*Id.*) Thus, Davis

27

appears to argue these claims are not really "successive" habeas claims (despite the fact that they appear in a successive habeas application), and therefore this Court should not apply §2244(b)(1) to Grounds Three and Six.

Davis' argument is rejected. 28 U.S.C. § 2244(b)(1) provides that "[a] claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed."  By Davis' own admission, Grounds Three and Six of the instant petition were presented in his prior habeas application.  Thus, they are clearly barred by §2244(b)(1).  While Davis asks this Court to treat them as if they are not successive claims, he presents no authority for doing so under the particular circumstances presented.  Davis did not obtain authorization from the Sixth Circuit to present these particular claims nor has he presented them to this Court in the form of a Rule 60(b) motion.

Accordingly, the Court finds Grounds Three and Six are not authorized by § 2244(b)(1) or the Sixth Circuit's May 5, 2014 Order, and recommends they be dismissed on that basis.

### B.    Ground Five

Ground Five asserts ineffective assistance of trial counsel based on counsel's alleged failure to "present evidence corroborating Mr. Davis' innocence."  (Doc. No. 1 at 82.)  Specifically, in this ground, Davis argues that "if this Court finds that Mr. Davis was provided with the Lorain County Jail Hearing Board Report or the statement of Jeremiah Abdullah prior to trial, then Mr. Davis' counsel was deficient for failing to present that

evidence to the jury."[9]  (*Id.* at 82, ¶ 127.)

Respondent argues this claim should be dismissed because Davis failed to raise it in his successive petition application in the Sixth Circuit.  (Doc. No. 12 at 17-19.)  She argues the only ineffective assistance claim presented by Davis to the Sixth Circuit involved trial counsel's alleged failure to present AT&T phone records that allegedly support Davis' claim of alibi.  (*Id.*)  The Sixth Circuit, however, expressly barred this claim, holding that "Davis could have raised an ineffective-assistance claim based on this evidence in his first habeas petition."  *In re: Ian R. Davis, aka Benson Davis*, Case No. 13-3981 (6th Cir. May 5, 2014).  Respondent argues Davis' prior claim of ineffective assistance of trial counsel for withholding the phone records "is not based on the same facts as his instant claims of ineffective counsel for failing to investigate and/or present the evidence of the Lorain County Jail Investigative Report and Jeremiah Abdullah's interview statement."  (Doc. No. 12 at 18.)  Thus, Respondent maintains Davis did not receive permission to pursue this claim pursuant to 28 U.S.C. § 2244(b) and this Court therefore lacks jurisdiction to consider it.

Davis responds as follows:

The Sixth Circuit Court of Appeals authorized this Court to consider Davis' "claims stemming from Avery's alleged perjury." *In re Davis*, Case No. 13-3981, Order, at 4 (6th Cir. May 5, 2015).  To the extent that Davis' ineffective assistance of counsel claim arises from a failure to locate or present the jail report, it is a claim "stemming from Avery's alleged perjury."  **However, Davis concedes that this ground for relief was not raised in the state courts, nor was it presented to the Sixth Circuit Court of Appeals in its present form**.  However, because dismissing an

---

[9] In his Traverse, Davis emphasizes that he believes the State failed to disclose either the jail report or Abdullah's statement and states he "brings this ineffective assistance of counsel claim only as an alternative argument."  (Doc. No. 17 at 65.)

> otherwise meritorious claim based on a *pro se* litigant's failure to
> adequately present it to the courts would be a fundamental miscarriage of
> justice, Davis asks this Court to consider his fifth ground for relief.

(Doc. No. 17 at 65) (emphasis added).  He maintains the miscarriage of justice

exception has been applied to overcome "various procedural defaults," noting it is

"grounded in the equitable discretion of habeas courts to see that federal constitutional

errors do not result in the incarceration of innocent persons."  (*Id.*)

Davis' fifth ground for relief should be dismissed.  This Court does not have

jurisdiction to consider a successive habeas petition absent authorization from the Sixth

Circuit.  *See e.g., In re King, 190 F.3d 479, 482 (6th Cir. 1999)* (noting that "a district

court cannot address the merits of a second or successive habeas corpus petition until

the court of appeals has authorized the filing of the petition under § 2244(b)(3)").  Here,

the Sixth Circuit authorized Davis to file a successive petition based on the application

he presented.  That court did not authorize him to file the specific ineffective assistance

of trial counsel claim presented in Ground Five.  Indeed, as noted above, Davis

expressly acknowledges he did not raise this claim in his application to the Sixth Circuit.

As Davis did not seek or receive permission from the Sixth Circuit to raise

Ground Five in his successive habeas application, this Court is not authorized to

consider it.  Moreover, the Court finds Davis has failed to demonstrate that this ground

should nonetheless be considered on the basis of the "miscarriage of justice" exception.

Davis' *pro se* status does not excuse his failure to raise this claim in his successive

habeas application.  Davis was certainly aware of both the Jail Investigation Report and

the Abdullah statement when he filed his application in the Sixth Circuit.  He was

capable of successfully filing the application on a *pro se* basis and offers no plausible

30

explanation for failing to include Ground Five in that application.

Accordingly, the Court finds Ground Five is not authorized by § 2244(b)(2) or the Sixth Circuit's May 5, 2014 Order, and recommends it be dismissed on that basis.

### C.  Ground Seven

Ground Seven asserts that Davis is "actually innocent of Marsha Blakely's murder and felonious assault."  (Doc. No. 1 at 92.)

Respondent argues that stand-alone claims of actual innocence based on newly discovered evidence are non-cognizable in habeas proceedings.  (Doc. No. 12 at 19.) She maintains that "[i]n that this ground does not present a free-standing cognizable constitutional ground, it cannot 'establish by clear and convincing evidence that, *but for constitutional error*, no reasonable factfinder would have found [Davis] guilty.'" (*Id.* at 20) (emphasis in original).

Davis argues that, although the Supreme Court has not decided the issue, "several circuit courts have acknowledged the existence of a freestanding claim of actual innocence," including the Third, Eighth, and Ninth Circuits.  (Doc. No. 17 at 66-67.)  He argues the evidence clearly establishes that he can meet the "extraordinarily high standard of innocence."  (*Id.*)

The Court agrees with Respondent that free-standing actual innocence claims are non-cognizable in these federal habeas proceedings.  In dismissing Alfred Cleveland's free-standing actual innocence claim, Judge Zouhary recently addressed this issue as follows:

> The Supreme Court has never recognized a stand-alone habeas claim of actual innocence.  "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief

31

absent an independent constitutional violation occurring in the underlying criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).  The Supreme Court recently acknowledged the absence of precedent for such a claim—"Whether such a federal right exists is an open question.  We have struggled with it over the years, in some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."  *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009).  Citing Supreme Court precedent (or more aptly, the lack therefore), courts have held that a freestanding claim of actual innocence in a non-capital case based on newly discovered evidence is not a proper ground for habeas relief.  *See Cunningham v. Dist. Attorney's Office for Escambia County*, 592 F.3d 1237, 1272 (11th Cir.2010) ("[T]his Court's own precedent does not allow habeas relief on a freestanding innocence claim in non-capital cases."); *Sellers v. Ward*, 135 F.3d 1333, 1339 (10th Cir.1998) ("[T]he claim of innocence grounded in [multiple personality disorder] itself is not a basis for federal habeas corpus no matter how convincing the evidence.").

This Court is not in a position to create a new constitutional claim and define the "high standard" necessary for such a claim where the Supreme Court has expressly declined to do so. Thus, as the law currently stands, actual innocence claims only operate to excuse procedural default so that a petitioner may bring an independent constitutional challenge. *Herrera*, 506 U.S. at 400, 404, 113 S.Ct. 853.  To the extent Cleveland's first ground alleges a free-standing claim of actual innocence, his claim is not cognizable. Any such claim must be tied to a constitutional injury.

*Cleveland v. Bradshaw*, 65 F.Supp.3d 499, 514-515 (N.D. Ohio 2014) (Zouhary, J.)

Moreover, while Davis asserts that some circuit courts of appeal have recognized such a claim, the Sixth Circuit has repeatedly held that actual innocence is not cognizable as a free-standing habeas claim, particularly in the context of non-capital proceedings.  *See Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007).  *See also Thomas v. Perry*, 553 Fed. App'x 485, 486 (6th Cir. Jan. 15, 2014) ("Thomas' freestanding claim of actual innocence based on newly discovered evidence is not cognizable on federal habeas review"); *Sitto v. Lafler*, 2008 WL 2224862 at * 1 (6th Cir.

May 28, 2008) ("[W]e continue to adhere to the rule that a free-standing innocence claim is not cognizable for habeas review"); *Wright v. Stegall*, 2007 WL 2566047 at * 3 (6th Cir. 2007) ("Since the Supreme Court has declined to recognize a freestanding innocence claim in habeas corpus, outside the death-penalty context, this court finds that petitioner's claim is not entitled to relief under available Supreme Court precedent."); *Hoop v. Jackson*, 2015 WL 6735895 at * 22 (S.D. Ohio Nov. 4, 2015) ("Case law in the Sixth Circuit establishes that the Supreme Court of the United States has never recognized a free-standing or substantive actual innocence claim."); *Carter v. Bradshaw*, 2015 WL 5752139 at * 51 (N.D. Ohio Sept. 30, 2015) (Pearson, J.); *Keenan v. Bagley*, 2012 WL 1424751 at fn 28 (N.D. Ohio April 24, 2012) (Katz, J.); *Johnson v. Kelly*, 2015 WL 1298711 at * 11 (N.D. Ohio March 23, 2015) (Zouhary, J., adopting report and recommendation of Baughman, M.J.)

In light of the above, Davis' seventh ground for relief should be dismissed.  As this claim is non-cognizable, Davis cannot satisfy §2244(b)(2)'s requirement that "the facts underlying the claim, if proven and viewed in the light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, *but for constitutional error*, no reasonable factfinder would have found [him] guilty.'"  28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added).

Accordingly, the Court finds Ground Seven is not authorized by § 2244(b)(2) and recommends it be dismissed on that basis.

### D.    Grounds One, Two and Four

Respondent appears to concede that Grounds One, Two and Four are authorized by the Sixth's Circuit's May 5, 2014 Order, stating these claims "constitute

the crux of those permitted claims 'stemming from Avery's alleged perjury' that the Sixth

Circuit passed through 'gate one' in its § 2244(b) Order for further review by this Court

in this successive petition."  (Doc. No. 12 at 20.)

Ground One alleges the State presented testimony at Davis' trial that it knew or

should have known was false.  (Doc. No. 1 at 39.)  Specifically, this Ground asserts that

Avery's 2006 recantation affidavit demonstrates, not only that Avery's trial testimony

was false, but that Avery told prosecutor Jonathan Rosenbaum he was lying for the

reward money and Rosenbaum nevertheless pressured him to testify falsely at Davis'

trial.  (*Id.*)  Davis asserts that, "[h]ad [he] known at trial that Avery, Jr., unprovoked,

admitted to the prosecutor that he lied, he would have impeached Avery, Jr., who

provided the only evidence connecting him to the crime."  (*Id.* at 40.)

Ground Two asserts a *Brady* claim based on the State's alleged failure to

disclose a Lorain County Jail Hearing Report, which Davis claims undermined Avery's

credibility and "proved that his testimony in Mr. Davis' trial was false."  (*Id.* at 53.)  This

Report (dated December 23, 1991) is the result of an investigation that was completed

after Avery claimed that, while held in the Lorain County jail on contempt charges during

Lenworth Edwards' first trial, corrections officers permitted Edwards to threaten Avery.

(*Id.*)  Avery testified regarding this alleged series of events in Davis' trial, claiming he

recanted in Edwards' first trial because Edwards threatened him.

In his second ground, Davis claims the Lorain County Jail Hearing Report

"proved that Avery, Jr. fabricated his story: he was never threatened by Lenworth

Edwards, and thus that did not explain why he recanted in Edwards' trial."  (*Id.* at 54.)

Davis argues the Jail Hearing Report is material evidence and the prosecution failed to

disclose it prior to his trial.  He maintains he could have used the report to undermine

Avery's credibility and argues further that:

> The report also demonstrates that, despite his testimony in Mr. Davis' trial,
> when Avery, Jr. recanted in Mr. Edwards' trial, he had no reason to do so.
> A jury, learning that Avery, Jr. had no external reason to recant, would
> have believed the recantation rather than his trial testimony, which was
> motivated by money and pressure from the prosecutor.  Exhibit 1, p. 3-4.
> Avery, Jr.'s allegations against Mr. Edwards gave the jury the impression
> that Mr. Edwards, who testified in Mr. Davis' trial, was threatening and that
> he, and by association, Mr. Davis, had something to hide. Had the report
> been disclosed and Mr. Davis able to use it in his trial, it would have
> mitigated this negative inference made by the jury.  Because Avery, Jr.
> was the entirety of the case against Mr. Davis, the report is material and
> there is a reasonable probability that, had it been disclosed, the result of
> Mr. Davis' trial would have been different.

(*Id.* at 55-56.)

Finally, in Ground Four, Davis asserts a cumulative *Brady* claim based on the

State's alleged failure to disclose (1) Avery's statement to prosecutor Rosenbaum that

he was lying for the money, and (2) the Lorain County Jail Hearing Board Report.[10]

(Doc. No. 1 at 80, ¶ 120.)

With regard to Ground One, Respondent argues, at length, that Avery's 2006

recantation affidavit is not credible and, therefore, "cannot provide clear and convincing

evidence that, but for constitutional error, no reasonable factfinder would have found

[Davis] guilty of murder and felonious assault."  (Doc. No. 12 at 21-30.)  Thus,

Respondent asserts this ground must be rejected pursuant to 28 U.S.C. §

---

[10] This cumulative *Brady* claim is also based on the State's alleged failure to
disclose Jeremiah Abdullah's 1991 statement to police.  (Doc. No. 1 at 80, ¶ 120.)
Because the Sixth Circuit did not authorize this Court to consider claims relating to
Abdullah's statement, the Court will not consider that statement in the context of this
ground.

2244(b)(2)(B)(ii).  (*Id.* at 30.)

With regard to Ground Two, Respondent first asserts the Lorain County Jail reports[11] are not *Brady* material because they do not relate to the Blakely or Epps murders and, instead, are purely internal jail records investigating Avery's complaint against jail staff.  Respondent also maintains the reports cannot support a *Brady* claim because the information contained in those reports was available from another source; *i.e.*, the testimony of corrections officer Darrell Board, who testified at the trials of both Lenworth Edwards and John Edwards regarding the jail investigation.  Respondent then argues the reports are not exculpatory as they are merely cumulative evidence of Avery's lack of credibility.  Finally, Respondent maintains that, even if the reports were withheld in violation of *Brady*, "Davis cannot demonstrate prejudice . . . because the information contained in this jail investigation hearing report was disclosed to the jury in the trials of Lenworth Edwards and John Austin Edwards via the testimony of Corrections Officer Darrell Board," and both of those men were nonetheless convicted. (Doc. No. 12 at 36.)  Based on the above, Respondent argues Ground Two should be denied because Davis cannot establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty, pursuant to § 2244(b)(2)(B)(ii).

Finally, with regard to Ground Four, Respondent argues that this ground should be dismissed because it "merely restates Davis' first three meritless (and/or disallowed)

---

[11] Respondent references two jail reports, both from December 1991.  The first is an incident report dated December 19, 1991 (Doc. No. 12-8 at Exh. 101) and the second is a "Decision of the Hearing Board" dated December 23, 1991 (Doc. No. 12-8 at Exh. 102.)

grounds."  (Doc. No. 12 at 37.)

As noted above, Davis must satisfy a two-pronged test in order to be entitled to a review on the timeliness, procedural default or merits of his claims.  *See Lott*, 2007 WL 2891272 at * 13; *Morris*, 2006 WL 2639497 at * 5.  First, Davis must show diligence; *i.e.*, that "the factual predicate for his claim could not have been discovered previously through the exercise of due diligence."  28 U.S.C. § 2244(b)(2)(B)(i).  *See also Lott,* 2007 WL 2891272 at * 13; *Morris*, 2006 WL 2639497 at * 5.  Second, Davis must show that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(2)(B)(ii).  *See also Lott*, 2007 WL 2891272 at * 13; *Morris*, 2006 WL 2639497 at * 5.

Davis must satisfy both prongs in order to satisfy §2244(b)(2)(B).   As it is determinative of this inquiry, the Court will address the second prong set forth in §2244(b)(2)(B)(ii) first.

### 1.      Actual Innocence under § 2244(b)(2)(B)(ii)

#### a.      Legal Standard

The threshold articulated in §2244(b)(2)(B)(ii) has been described as an "actual innocence" standard.  *See e.g., Caldwell v. Lafler*, 2008 WL 907536 at * 4-5 (W.D. Mich. March 31, 2008);  *Lott v. Bagley*, 2007 WL 2891272 at * 14 (N.D. Ohio Sept. 28, 2007) (O'Malley,J.)  *See also Case v. Hatch*, 731 F.3d 1015, 1031-1032 (10th Cir. 2013) (noting that "[t]his standard has been described as a 'strict form of 'innocence'") (quoting 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice & Procedure* §

28.3[e], at 1628–29 (6th ed. 2011)).

In the context of habeas corpus jurisprudence, however, there exist two separate and distinct "actual innocence" standards. Another court in this District explained the difference between these two standards as follows:

> In *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Court held that "a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally-barred habeas petition." *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir.2005) (citing *Schlup*, 513 U.S. at 317). Such a claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Souter,* 395 F.3d at 588-89 (quoting *Schlup*, 513 U.S. at 315).
>
> To satisfy the *Schlup* actual innocence standard, a petitioner must demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 327). Moreover, "actual innocence means factual innocence, not mere legal insufficiency." *Souter*, 395 F.3d at 588-89 (quoting *Schlup*, 513 U.S. at 327). Such a claim "requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 324). The *Schlup* Court further cautioned that "the actual innocence exception should remain rare and only be applied in the extraordinary case." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 321).
>
> **In enacting the Anti-Terrorism and Effective Death Penalty Act (AEDPA), Congress "adopted a more stringent actual innocence exception" in the context of second or successive petitions such as Caldwell's**. *Souter*, 395 F.3d at 590 [footnote omitted]. First, Petitioner must establish that the factual basis for his [successive habeas] claim[s] could not have been discovered previously through the exercise of due diligence. *See* 28 U.S.C. § 2244(b)(2)(B)(i). This was not a requirement in the *Schlup* actual innocence analysis. Petitioner must also demonstrate not merely that "it is more likely than not" that no reasonable juror would have found him guilty, but instead Petitioner must establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. *See* 28 U.S.C. §

2244(b)(2)(B)(ii) (emphasis added). The Supreme Court has interpreted this provision as requiring a petitioner to demonstrate by clear and convincing evidence that he is innocent of the crimes for which he was convicted. *Calderon*, 523 U.S. at 558 ("a federal court can consider a claim presented in a second or successive application only if the prisoner shows, among other things, that the facts underlying the claim establish his innocence by clear and convincing evidence").

*Caldwell v. Lafler*, 2008 WL 907536 at * 4-5 (W.D. Mich. March 31, 2008) (emphasis added).  *See also* *Case*, 731 F.3d at 1037 (observing that "[t]he *Schlup* standard appears to be more forgiving than subparagraph [§2244(b)(2)](B)(ii), since it allows a broader range of evidence to be evaluated by the court—old and new; admissible and inadmissible"); *Lott*, 2007 WL 2891272 at *14 (noting that "those courts that have opined on this statutory requirement [*i.e.*, § 2244(b)(2)(B)(ii)] have held that it is more stringent than the actual innocence standard set forth in *Schlup*.")

Under the more exacting actual innocence standard set forth in §2244(b)(2)(B)(ii), the Court must "consider the body of evidence presented at trial, 'add back' the evidence kept from the jury as the result of constitutional error, and then determine whether the evidence 'is clear and convincing, in light of the evidence as a whole, that no reasonable factfinder would have found [petitioner] guilty' but for the violation."  *Bell v. Tibbals*, 2013 WL 1283861 at * 12 (N.D. Ohio March 26, 2013) (Gaughan, J.) (citations omitted).  As explained by the Tenth Circuit in *Case v. Hatch*, 731 F.3d 1015 (10th Cir. 2013), "the analysis proceeds in three steps: (1) we start with the body of evidence produced at trial, (2) add 'evidence allegedly kept from the jury due to an alleged [constitutional] violation,' *Sawyer [v. Whitley]*, 505 U.S. at 349, 112 S.Ct. 2514, and (3) determine whether it is 'clear and convincing,' 'in light of the evidence as a whole,' that 'no reasonable factfinder would have' convicted."  *Case*, 731 F.3d at 1033.

39

In sum, the Court's task is "to look to the evidence the jury heard at trial, augmented by [the] evidence [linked to the constitutional violations] and then make a probabilistic determination about what reasonable, properly instructed jurors would do." *Bell*, 2013 WL 1283861 at * 12 (citing *House v. Bell*, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006)).  "The Court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.*

> b.    **The Evidence**

>> i.    **Evidence introduced at Davis' trial**

The Court begins by summarizing the relevant evidence introduced at Davis' trial. At approximately 9:18 a.m. on August 8, 1991, Blakely's body was found in an alley behind the Westgate Plaza in Lorain, Ohio.  Pathologist Richard Buchanan, M.D., who performed Blakely's autopsy, testified regarding Blakely's many injuries.  He stated Blakely had a "wound in the neck cutting across her windpipe and cutting across one of major veins in her neck," as well as a neck fracture.  (Doc. No. 12-6 at Tr. 50.)  She had "many broken ribs on the left side," and approximately 20 to 25 "little cuts on the back of the neck, mostly on the right side and extending around toward the front, with a few on the left side and mostly in the front."  (*Id.* at Tr. 50-51, 56-57.)  Dr. Buchanan testified Blakely had a large scrape on her left forehead,"many bruises in the scalp on the left side," and abrasions on her back.  (*Id.* at Tr. 51, 56.)

Dr. Buchanan also explained that leaf fragments were found on Blakely's lower back, under her clothing and stuck to her skin.  (*Id.* at Tr. 55-56.)  When asked specifically about the abrasions on her back, Dr. Buchanan agreed the abrasions were

40

"consistent with [Blakely] being drug along on the ground."  (*Id.* at Tr. 56.)  Dr. Buchanan

was also specifically asked about the numerous superficial skin wounds (or "little cuts")

found on Blakely's body.  (*Id.* at Tr. 56-57.)  He agreed these wounds would have been

painful but not fatal, and were "consistent with . . . some sort of torture type injury."  (*Id.* at

Tr. 57.)  Dr. Buchanan testified Blakely's neck wound was likely caused by a knife, while

her neck fracture and broken ribs were likely the result of being struck by a car.  (*Id.* at

Tr. 60.)  Finally, Dr. Buchanan opined Blakely's time of death was between midnight or

1:00 a.m. and 4:00 a.m. on August 8, 1991.  (*Id.* at Tr. 62.)

Lorain Police Detectives Richard Resendez and Geno Taliano testified they were

assigned to investigate the deaths of both Blakely and an individual named Floyd Epps.

(*Id.* at Tr. 111, 252.)  Blakely and Epps were friends, and Blakely often stayed at Epps'

apartment.  (*Id.* at Tr. 255.)  Epps' body was also discovered on August 8, 1991,

approximately a quarter mile away from Blakely's body.  (*Id.* at Tr. 252-255.)  The

detectives quickly identified Blakely and Epps and learned about their friendship.

Detective Taliano testified that, at approximately 11:00 a.m. on August 8, 1991, he and

Detective Resendez went to Floyd Epps' apartment.  (*Id.* at Tr. 256-257.)  Upon arriving,

the door was ajar and the apartment was empty.  The detectives looked around to see "if

there was anything that would alert [them] or become of interest to [them] involved in this

investigation."  (*Id.*)  They found and took custody of a small purse, which was

subsequently identified as belonging to Blakely.  (*Id.*)  They then secured the apartment

and "contacted the Lorain Metropolitan Housing Authority ["LMHA"], advised them that

we were going to secure that, asked them to rekey the doors, not to either clean the

apartment, re-enter the apartment, or allow anyone else to do that, and provide us with a

set of keys for the new keyed lock." (*Id.*)  The LMHA did so the next day, August 9, 1991.  (*Id.*)

As part of their investigation, Detective Taliano testified they talked to "more than 25 people" who may have known Blakely and/or Epps, including Delphenia Guice.  (*Id.* at Tr. 259, 276.)   On August 18, 1991, Guice approached an officer and stated she wanted to speak with the detectives involved in the Blakely case.  (*Id.* at Tr. 276.)  Detectives Resendez and Taliano went to Guice's residence and spoke to her that day.  (*Id.*)  Guice testified at Davis' trial regarding her interview with these detectives.  (*Id.* at Tr. 230-235.)  She stated that, during this time period, she dated Lenworth Edwards and he sometimes stayed at her place.  (*Id.* at Tr. 230.)  Guice testified she lent her motor vehicle to Edwards at approximately 10:00 p.m. on August 7, 1991 and he brought it back at 4:00 or 5:00 a.m. on August 8, 1991, the day that Blakely's body was found.  (*Id.* at Tr. 231.)  She stated that, afterwards, Edwards "kept saying" to her that he was with Guice during the time period he was out with her car, even though he was not.  (*Id.* at Tr. 234.)  Guice testified that, when she learned of Blakely's murder, she became scared and decided to talk to Taliano and Resendez, at which time she gave them a bag of Edwards' clothes.  (*Id.* at Tr. 230.)

Taliano testified the bag of clothes provided by Guice included a blue jean jacket that appeared to have blood on the front breast area.  (*Id.* at Tr. 277.)  Taliano sent the jacket to the Ohio Bureau of Criminal Identification ("BCI") along with blood samples from Blakely, Epps, and Lenworth Edwards.  (*Id.*)  He testified that, at that time, he hoped the blood on the jacket would match one of the victims; however, it did not.  (*Id.*)  Rather, the blood on the jacket matched Lenworth Edwards' blood sample.  (*Id.* at Tr. 278.)  BCI

serologist Dale Laux confirmed Taliano's testimony, stating he compared the blood on the jean jacket to samples from Blakely, Epps, and Lenworth Edwards.  (*Id.* at Tr. 76-77.) Laux testified the blood on the jacket could not have come from either Blakely or Epps, but could have originated from Edwards.  (*Id.* at Tr. 82-83.)  Laux also explained that the blood stains "originated at a point up above the stains on the jacket, and proceeded to be deposited in a downward angle, very, very near parallel to the jacket itself," which was consistent with a nosebleed.  (*Id.* at Tr. 82.)  Taliano testified BCI described to him the "angle in which this blood would have reached the jacket and the circumstances that may have happened."  (*Id.* at Tr. 278.)

At this point in the investigation, however, Taliano felt they had reached a "dead end."  (*Id.* at Tr. 259.)  After unsuccessfully seeking  assistance from Crime Stoppers, Detectives Taliano and Resendez asked the Lorain County Prosecutor's Office for assistance in putting up a reward for information leading to the arrest and prosecution of those responsible for the deaths of Blakely and Epps.  (*Id.* at Tr. 260-261.)  The Prosecutor's Office agreed, and offered to provide a reward of $2,000.  (*Id.* at Tr. 261.)

Thereafter, on September 10, 1991, William Avery, Sr. ("Sr.") (who had previously worked for the Lorain Police as an informant) approached Taliano and indicated he had information that was "of value."  (*Id.* at Tr. 263.)  Taliano was convinced Sr. did not have firsthand knowledge of the crimes, however, and "indicated to him that no reward would be provided unless I could talk to the person who had professed to be the eyewitness." (*Id.*)  The next day, on September 11, 1991, Sr.'s son, William Avery, Jr. ("Avery"), came forward and met with Detective Taliano.  (*Id.* at Tr. 264.)

On that date, Avery (also known by the street name "B.B.") advised Taliano he

43

was an eyewitness to the beating of Marsha Blakely at Epps' apartment.  (*Id.* at Tr. 264.)

Specifically, Avery told Taliano he owed about $3,000 to $4,000 to a New York drug

dealer he knew as "Al Monday" (aka Alfred Cleveland).  (*Id.* at Tr. 265.)  Avery stated

that, on August 7, 1991, he asked Cleveland for more drugs; Cleveland told him he didn't

have any; and Cleveland told Avery to come over and they would go get some.  (*Id.* at Tr.

265.)  Avery and Cleveland then drove to Epps' apartment, where a second car with

three males associated with New York drug trafficking also arrived.  (*Id.*)  These men

were later identified as Davis (aka "J.R."), Lenworth Edwards (aka "Will"), and John

Edwards (aka "Shakeme.")  (*Id.* at Tr. 265-266.)

Avery stated that he, Cleveland, and the men from the second car (including

Davis) entered Epps' apartment, where they encountered Blakely with another male New

York drug trafficker identified only as "Supreme."  (*Id.* at Tr. 266.)  Avery stated that, at

this point, Cleveland directed him (Avery) to assault Blakely because she owed him

money and/or drugs.  (*Id.*)  Avery refused because he had grown up with Blakely.  (*Id.* at

Tr. 266.)  The other men (except for Cleveland) then assaulted Blakely.  (*Id.*)

Notably, Taliano testified Avery told him Blakely began to fight back and struck

Lenworth Edwards in the face, after which he put his hands over his face and backed off.

(*Id.*)  The other men continued to assault Blakely until she was unconscious.  (*Id.* at Tr.

267.)  Avery stated they all then left the apartment.  (*Id.*)  According to Avery, Davis

dragged Blakely's unconscious body out of the apartment, across a sidewalk and a

grassy area, to the car in which Davis, Lenworth Edwards, and John Edwards had

arrived.  (*Id.* at Tr. 267.)  Avery told Taliano that Blakely was placed in the car with Davis,

Lenworth Edwards, John Edwards, and Supreme.  (*Id.*)  He stated he and Cleveland left

in Cleveland's car, after which Cleveland dropped Avery off near the projects.  (*Id.*)

Taliano testified Avery later represented that Cleveland returned at some point that night

and told him (Avery) that "we killed that crackhead bitch."[12]  (*Id.*)

Taliano testified he was convinced at the time that Avery was telling the truth

because his story was consistent with (among other things) the blood evidence from the

jacket provided by Guice:

> After talking with [Avery] on September 11th, that's when – that's one of
> the reasons that I was convinced that [Avery] was the first and
> subsequently the only person that really had firsthand information,
> information he couldn't possibly have gotten from either the street or any
> reports that may or may not have been in the papers, and the reason was
> that he had described in detail how Lenworth Edwards had been struck in
> the face, then backed away . . . after being struck by Marsha Blakely and
> covering his face.
>
> Talking to the BCI lab technician, he had described the angle in which this
> blood would have reached the jacket and the circumstances that may
> have happened and it was – it would have verified what our witness
> [Avery] had told us about how that could have occurred.

(*Id.* at Tr. 278.)  Taliano also testified Avery's statement that Blakely was dragged

through a grassy, leaf covered area was consistent with the fact that a piece of leaf or

"grassy substance" was found attached to Blakely's body during the autopsy.  (*Id.* at Tr.

279.)  After obtaining Avery's statement, Taliano testified he, Resendez, and a BCI lab

---

[12] During his initial police interview on September 11, 1991, Avery stated that,
after the assault on Blakely in Epps' apartment, he and Cleveland left in Cleveland's
car; Cleveland dropped off Avery near the projects; and Avery did not see Cleveland
again or hear anything about Blakely's murder that night.  (Doc. No. 39-2 at Exh. 16.)
On September 20, 1991, however, Avery underwent a polygraph exam, which indicated
he had not been completely forthcoming.  (*Id.*)  After police advised Avery of the
polygraph results, he gave a new statement, adding details to his initial statement.  (*Id.*)
He now told police that, after dropping Avery off, Cleveland returned to Avery's home a
few hours later and told Avery that "We took care of that junkie. . we knocked her off."
(*Id.*)

technician returned to Epps' apartment on September 18, 1991 in order to take photographs and process the scene for any possible blood or fiber samples.  (*Id.* at Tr. 257.)

The primary witness to testify against Davis was Avery himself.  (*Id.* at Tr. 138-225.)  Avery testified he knew Davis as "J.R." and had met him through selling drugs.  (*Id.* at Tr. 139.)  Avery's trial testimony was generally consistent with Taliano's description of Avery's September 11, 1991 statement to the police with regard to the beating of Blakely in her apartment and her removal from the apartment by Davis.  (*Id.* at Tr. 140-151.)  Avery also testified, however, that during the beating, Shakeme (i.e., John Edwards) screamed at Blakely "where's my shit at," which Avery took to mean that Shakeme "want[ed] his money or dope."  (*Id.* at Tr. 149-150.)  He further testified that, during the beating in Epps' apartment, there was a struggle and a table was "knocked over" and "turned over to the side."  (*Id.* at Tr. 219, 223-224.)

At trial, however, Avery testified differently from his September 1991 police interviews with respect to what happened after Blakely was removed from Epps' apartment and placed into a vehicle with Davis, Lenworth Edwards, John Edwards and Supreme.  While Avery initially told police that Cleveland dropped him off at home after the beating, Avery testified at trial that, in fact, he and Cleveland followed the motor vehicle containing Blakely to an alley behind Westgate Plaza.  (*Id.* at Tr. 152.)  When they arrived, Avery observed a third car already there along with an individual named "Justice."  (*Id.* at Tr. 153-154.)  Avery stated that, "we pulled up, they took her out of the car and took her around to the front of it . . . [a]nd the dude that was already there [*i.e.*, Justice] he had a shiny object, and he was swinging it at her."  (*Id.* at Tr. 154.)  Avery

testified he exited the car and ran because he was scared.  (*Id.*)  He estimated these events occurred at approximately midnight on August 8, 1991.  (*Id.* at Tr. 155-156.)

Avery acknowledged he did not tell Detective Taliano the "whole truth" when he was first interviewed on September 11, 1991.  (*Id.* at Tr. 158.)  He stated he lied because he was scared and his father told him "not to say nothing about being behind the plaza." (*Id.*)  Avery was also questioned (at length and during both direct and cross-examination) regarding the fact that he recanted his testimony during the trial of Lenworth Edwards in December 1991.  (*Id.* at Tr. 160-173.)  Specifically, Avery testified that, after Edwards' trial commenced, he demanded (at his father's insistence) $10,000 to testify.  (*Id.* at Tr. 159-160.)  Avery explained prosecutor Rosenbaum refused to pay him and, because of that, Avery refused to testify at Edwards' trial.  (*Id.* at Tr. 160-161.)  Avery testified he was sent back to the county jail, where the following occurred:

> Q: So, you refused to testify and the judge locked you up?
>
> A: Yes.
>
> Q: And what happened to you at the county jail?
>
> A: Then I was approached by one of the C.O.'s [*i.e.*, corrections officers]
>
> Q: And what do you mean by "approached by one of the C.O.'s"?
>
> A: He asked me if I was given a hundred thousand dollars, would I still testify, and I told him yeah, because if I tried to get the money, then I might end up dead myself.  So really, I didn't have a choice.
>
> Q: And did something else happen to you at the county jail?
>
> A: Yeah.  Well, I was in the room where I was locked up at, they brought Lenworth down to my door.

* * *

47

Q:      Was it his trial you refused to testify at?

A:      Yes.

Q:      So he was in the same area as you in jail?

A:      Yes.  We was put in the same room.

Q:      Exact same room?

A:      Well, it's the hallway, the holding cells.  We was all in the hallway.

Q:      And different holding cells in the same hallway?

A:      No. We was right there.  Lock–

Q:      I see.  Before you went to the holding cells?

A:      Yeah.

Q:      And what happened then?

A:      I went in my holding cell and shut the door and they locked it. And he asked me why did I tell–

        MR. GRUNDA:        Objection to what he said.

        THE COURT:          Sustained.

Q:      Did you see– were you threatened by Lenworth at this time?

* * *

A:      Yes.

Q:      Can you tell us what Lenworth did to threaten you?

* * *

A:      Yeah. He did like this, and he did like that to me (indicating).

Q:      So he made a motion like he was slitting a throat, and he pointed at you?

A:      Yes.

(*Id.* at Tr. 161-163.)  Avery went on to testify he was scared and asked to talk to

48

prosecutor Rosenbaum.  (*Id*. at Tr. 163-164.)  Avery testified Rosenbaum did not get in contact with Avery, so Avery contacted Lenworth Edwards' lawyer.  (*Id*. at Tr. 164.)  He explained he then testified at Lenworth Edwards' trial, recanting his statement to Detective Taliano and claiming he only claimed to be an eyewitness in order to get the reward money.  *(Id*. at Tr. 164-165.)  When asked why he recanted, Avery testified "I was scared for my family and myself" and thought by recanting "it would all be over with, [and] my family would be safe."[13]  (*Id*. at Tr. 166.)

Avery was then questioned about his change in testimony after his recantation during Edwards' December 1991 trial.  He testified that, after Edwards' trial ended in a mistrial as a result of his recantation, he (Avery) eventually told an agent from the FBI that he had been threatened in jail.  (*Id*. at Tr. 171.)  Avery stated that, as a result of that interview, he was re-contacted by Detective Taliano and prosecutor Rosenbaum.  (*Id*.)  Avery testified he then spoke with Detective Resendez and admitted he had accompanied Cleveland behind Westgate Plaza and witnessed Blakely's murder.  (*Id*.)  Avery also testified he received a total of over $5,000 for testifying at Edwards' second trial.[14]  (*Id*. at Tr. 217.)

Davis' defense was that he was not in Lorain on the night of the murder.  His

---

[13] During Avery's examination, Avery testified that Lenworth Edwards' first trial ended in mistrial and he (Avery) was afterwards put in jail.  (*Id*. at Tr. 172.)

[14] Detective Taliano was also questioned, at length, regarding (1) Avery's failure to tell "the whole truth" during this September 1991 interviews with detectives; (2) his refusal to testify during Edwards' first trial and resultant incarceration for contempt; (3) his allegation that he was threatened by Edwards while in jail for contempt; (4) his recantation during Edwards' first trial and subsequent incarceration for perjury; (5) his interview with Taliano and Rosenbaum after Edwards' first trial; and (6) his testimony at Edwards' second trial.  (*Id*. at Tr. 267-274.)

girlfriend at the time, Florence Michelle Brooks, testified that Davis left Lorain on August 2nd and "said he was going back home" to New York.  (*Id.* at Tr. 321.)  She also testified she did not see Davis in Lorain on August 8th or 9th but he had called her on the phone on August 8th.  (*Id.* at Tr. 320.)  Lenworth Edwards was also called to testify at Davis' trial.  (*Id.* at Tr. 393-403.)  Edwards testified he did not see Davis in Lorain "from like the first couple of days after August, through [August] 13th."  (*Id.* at Tr. 395.)  He also testified that he (Edwards) had never met Blakely or Epps, and had never been to Epps' apartment.  (*Id.* at Tr. 397.)

Finally, Davis took the stand in his own defense.  (*Id.* at Tr. 405-443.)  He testified he first came to Lorain in May 1991 for a Run DMC concert.  (*Id.* at Tr. 407-408.)  He met Ms. Brooks at that time and stayed with her until sometime in June 1991, when he returned to New York.  (*Id.* at Tr. 409-410.)  Davis claimed he came back to Lorain sometime towards the end of June and stayed with Ms. Brooks until the end of July, when he again returned to New York.  (*Id.* at Tr. 411.)  He insisted he was in New York on August 8th and did not return to Lorain until August 11th or 12th.  (*Id.* at Tr. 411-412, 442.)  Davis testified he never met Blakely or Epps, and denied assaulting or killing Blakely.  (*Id.* at Tr. 412-413.)

### ii.    *Brady* Evidence

The Court next considers the evidence that was allegedly kept from the jury as the result of constitutional error.  *See* Bell*, 2013 WL 1283861 at * 12*; *Case*, 731 F.3d at 1033.  As the Tenth Circuit has explained, "§2244(b)(2)(B) imposes a strict standard restricting the kinds of evidence that federal courts may consider when entertaining a state prisoner's successive-petition claim."  *Case*, 731 F.3d at 1035.  Specifically, "the

inquiry under subparagraph (B)(ii) excludes any consideration of evidence not rooted in constitutional error at trial."  *Id.*  "The factual universe does not encompass new facts that became available only after trial and that are not rooted in constitutional errors occurring during trial."  *Id.* at 1038.

Thus, in its determination of whether Davis meets the requirements of §2244(b)(2)(B)(ii), this Court "adds back' only that evidence tied to constitutional errors allegedly occurring at Davis' trial.  Moreover, in conducting this inquiry, the Court is mindful of the fact that the Sixth Circuit authorized Davis to pursue only those "claims stemming from Avery's alleged perjury."  *In re: Ian R. Davis, aka Benson Davis*, Case No. 13-3981 (6th Cir. May 5, 2014).  The Court, therefore, "adds back" only that *Brady* evidence relating to Avery's alleged perjury; *i.e.*, Avery's 2006 recantation affidavit and the Jail Investigation Reports.

### a.    Avery 2006 Recantation Affidavit

In February 2006, Avery executed an affidavit recanting his testimony at the trials of Davis, Cleveland, Lenworth Edwards, and John Edwards.[15]  (Doc. No. 12-3 at Exh. 55,

---

[15] Based on testimony taken during the December 2013 evidentiary hearing in *Cleveland*, Judge Zouhary described the circumstances regarding the origin of Avery's 2006 recantation affidavit as follows: "Paul Ciolino, a private investigator working on behalf of Cleveland, testified about how Avery's 2006 affidavit (EX 12) came to pass. Ciolino was first contacted by Cleveland's wife around 1999 (TR 25).  After reviewing the case file, Ciolino attempted to locate Avery, which was difficult because Avery was transient, had no job, and was not receiving public assistance (TR 35).  Ciolino found Avery after seven years of searching.  In 2006, Avery's mother received a phone call from Cleveland's father, Leon (APP 285).  Leon asked Avery's mother to have Avery get in touch with him, which Avery did. Leon asked Avery to meet with Ciolino and Bruce Ellison, one of Cleveland's attorneys, which Avery agreed to do.  Ciolino located Avery in Detroit  and spoke with him for over two hours, at the conclusion of which Avery signed an affidavit (APP 38).  Witnessing Avery's signature were Ciolino, Ellison, and a Detroit-area notary Ciolino found at a currency exchange near Ciolino's hotel (APP 37).

Page ID#s 1153-1158.)  In the affidavit, Avery avers, in pertinent part, as follows:

> At the trials of Al Monday and those charged with him, I testified under oath that I was an eyewitness to Alfred Cleveland, who I knew as Monday, along with people I knew as JR [i.e., Davis], Will and Shakeem beat Marsha Blakely at Floyd Epps apartment in Lorain, Ohio and then murdered her behind Charlie's bar in Lorain.  All of this was a lie.  I never witnessed the murder of Marsha Blakely, was not with her or Alfred Cleveland the night she was murdered.  This was a story my father told me to tell.

> * * *

> I knew Al Monday, Shakeem, Will and [Davis] as drug dealers from New York.  I never saw any of them with Marsha Blakely or heard that she had been with any one of them.  I knew these men because I sold drugs for them.  There came a time when I owed Al Monday money for drugs.  Monday never asked me to beat anyone or do anything to anyone as a way of paying off my debt.  I never saw Monday act or threaten violence.

> I first heard of the murder of Marsha Blakely while at my then girlfriend Patricia Gaddy'[s] apartment in the Projects.  A woman came to the house and said Marsha's body was found.  I did not know who had done this, did not know anyone who was involved.

> I then went to Charlotte Watkins' house who was also a girlfriend of mine in the early morning.  My Dad came over to Charlotte's house and told me Marsha was dead and they were going to kill me too.  He said he would tell me how you can get out of all this.  He told me that I could say I was a witness.  He pulled out some crack and we smoked.  He then told me I had to memorize a story.  This continued throughout the day and into the next.  The story he told me to tell was that Al Monday came to get money, that Al said to go with him, that we went in car together to Floyd Epps, that the rest were there (Will, [Davis], Shakeem).  He said to say that Al wanted me to beat Marsha up and then did.  I have never been in a car with Monday, that night or any time.

> * * *

> My Dad set up a meeting with police.  He was present during the interview.  They showed me pictures of an apartment which they said was Floyd Epps'

---

Ciolino and Ellison typed the affidavit at the hotel after speaking to Avery and took it to the currency exchange for Avery's signature." *Cleveland v. Bradshaw*, 65 F.Supp.3d 499, 519-520 (N.D. Ohio 2014) (Zouhary, J.)

and asked me to describe what happened in the apartment. I then made up
the story of what happened in the apartment, based upon the pictures.

(*Id.*)  Avery then states he told his father that "this was wrong," but his father "said I had

to go to the police and continue to tell this story or he would kill me, my son, and

Charlotte, if I told anyone about his plan.  I believed him."  (*Id.*)

Avery claims he told prosecutor Rosenbaum his eyewitness testimony was false.

Avery describes their conversation as follows:

> I told Prosecutor Rosenbaum that I was lying for the money.  We were
> alone in a room at the courthouse.  He got very upset at me and scared
> me.  He told me that if these dudes don't go down for his, that I would.
> When I then asked him for the $10,000, he got more upset.  I later that
> day testified that I had lied for the money.  This was true (and also
> because my Dad had threatened me which I did not mention in my
> testimony).  I was then charged with perjury, although it was true that I lied
> for the money and because I was afraid.  I was afraid at the time because
> of what my Dad told me of how these New York guys would be after me –
> or he would be.

(*Id.*)

Avery also recounts in his affidavit that, in summer 2005, he "went to the FBI and

told them about the murder and my false testimony against Monday in Lorain."  (*Id.*)  He

states the FBI said they "would check it out and get back to me;" however, he "never

heard from them again."[16]  (*Id.*)

---

[16]  Davis attaches to the Petition an affidavit dated August 2, 2006 from FBI
Agent William Beachum.  (Doc. No. 1-3.)  This affidavit is not part of Davis' state court
record but was an exhibit in the evidentiary hearing before Judge Zouhary in the
Cleveland case and, therefore, is part of the expanded record in this case.  (Doc. No.
39-3, Exh. 29.)  In this affidavit, Beachum states he met with Avery on November 24,
2004 at Avery's behest.  Beachum states Avery claimed he lied about witnessing
Blakely's murder and alleged his father had, in fact, committed the crime.  (*Id.*)
Beachum avers Avery "claimed that his father Avery Sr. then crafted a plan to accuse
four (4) individuals of murder so Avery Sr. could get away with murder and collect the
reward money.  Avery Sr. directed Avery Jr. to say he was at the murder scene so he

Finally, Avery indicates he "wants to make this right."  (*Id.*)  He states he "feel[s] that I have to come clean and tell the truth" and "it is only now that I finally feel that I can do this without being intimidated or killed by own father."  (*Id.*)  Finally, Avery states: "if I don't tell the truth and get this off my chest, then my spirit can't be good with God." [17] (*Id.*)

### b.     Jail Investigation Reports

The Lorain County Jail undertook an investigation as a result of Avery's claim that he was threatened by a corrections officer and/or Lenworth Edwards while being held in the Lorain County Jail after refusing to testify at Edwards' trial.  There appear to be two documents generated by the Jail as a result of this investigation.

The first is an "Incident Report" dated December 19, 1991, which appears to have been completed by Lt. Doug Newman.  (Doc. No. 12-8 at Exh. 101.)  This report states as follows:

---

could testify against the individuals."  (*Id.*)  Avery told Beachum he was "motivated to testify" because he owed $5,000 to Cleveland and Avery Sr. told him that Cleveland would kill Avery.  (*Id.*)  Beachum further averred that "[a]t no time during my interview with Avery Jr. did he allege that law enforcement had shown him photographs to give him insight into the crime."  (*Id.*)  Avery also told Beachum that Avery Sr. was involved in another murder in the Detroit area a few years prior.  (*Id.*)  Beachum eventually located Avery Sr., who denied any involvement in Blakely's murder and offered to take a polygraph.  (*Id.*)  Avery Sr. told Beachum that Avery Jr. witnessed a murder in Lorain and Blakely was murdered by "New Jersey" drug dealers because she took money and crack cocaine belonging to the dealers.  (*Id.*)

[17]  Avery subsequently gave an oral sworn statement in April 2006.  Judge Zouhary described this statement as follows: "Two months after Ciolino procured the February 2006 affidavit, he sought out Avery for another recorded statement.  He again found Avery in the Detroit area.  Ciolino rented a car and brought a court reporter with him.  The court reporter gave Avery an oath and took down a statement in the back of the car.  The questions and answers lasted approximately forty minutes (TR 41–42).  Avery again claimed he did not witness Blakely's murder (APP 290).  He also provided more detail about his upbringing with Senior."  *Cleveland*, 65 F.Supp.3d at 520.

At approximately 2:00 p.m. on December 19th, 1991, Lt. Clinton Kendricks advised me that he received a phone call from Lorain Patrolman David Wrice.  Ptlm Wrice allegedly informed Lt. Kendricks that officers of this facility were allowing accused murderer Lenworth Edwards to threaten Inmate William Avery (a witness against Edwards).  Ptlm. Wrice told Lt. Kendricks that he received a phone call at home from Inmate William Avery at 12:10 a.m. this date.  Avery allegedly told Wrice that last [night] or in the early morning hours of today, some corrections officers brought inmate Edwards to Avery's cell and allowed Edwards to threaten Avery.

A check of the pod log (North) revealed that Inmate Edwards never left the housing area.  Furthermore, this officer contacted c/o Schmidt (who worked in Edwards' housing area last night) at home and Schmidt stated that to the best of his knowledge Edwards was not taken out of the housing area.

(*Id.*)  The report concludes by stating that "[b]ased on the above information, I ordered Inmate Avery placed in lock-up pending a hearing for making false and malicious statements."  (*Id.*)

The second document is a "Decision of the Hearing Board" dated December 23, 1991.  (Doc. No. 12-8, Exh. 102.)  This Report summarizes the evidence presented at the hearing as follows:

**1. Inmate**: Avery– Says while inmate Edwards was going to and from court an officer (he refuses to say who) allowed inmate Edwards to stand in front of the isolation door and make threats to him.  Says the other two inmates in the cell saw him.  Says an officer has threatened him but will not say who this officer is.

**2.  Witness Statements**: Hearing Board– Inmate Avery was booked in on 12/16/91.  Inmate Edwards went to Court on 12/17 & 12/18/91.  C/O Diaz was in Control One on the 17th and C/O Carreon was in Control One on the 18th.  C/O Diaz is scheduled off his date (12/23/91).  The Board spoke with C/O Carreon.  He stated when Edwards was brought up for Court he went through Door 151 and Inmate Avery was standing in the window of the door.  Inmate Edwards then turned around after the door closed and was saying something to Inmate Avery.  An officer, possibly C/O Quinones or Pabon then motioned for Inmate Edwards to continue on to booking and did not let him stand there and continue.  Inmate Avery declines to say who the officer was who allowed this alleged incident to take place or

55

who the officer is that he claims has threatened him.  The Board does not
find evidence that there is a basis for these accusations.

(*Id.*)  The Report indicates a verdict of guilty on the violation of Making False and

Malicious Statements Towards Staff.[18]  (*Id.*)

### c.  Analysis

For the following reasons, the Court finds Davis has failed to demonstrate that the

facts underlying his claims in Grounds One, Two and Four, if proven and viewed in light

of the evidence as a whole, would be sufficient to establish that, but for constitutional

error, no reasonable factfinder would have found him guilty of the underlying offense,

pursuant to 28 U.S.C. § 2244(b)(2)(B)(ii).

The basis of Davis' first ground for relief is Avery's 2006 recantation affidavit, in

which Avery states that (1) he lied about witnessing Blakely's assault and murder; (2) he

told prosecutor Rosenbaum that he lied; and (3)  Rosenbaum threatened him and

pressured him to testify falsely at Davis' trial.  Davis asserts that, "[h]ad [he] known at trial

that Avery, Jr., unprovoked, admitted to the prosecutor that he lied, he would have

impeached Avery, Jr., who provided the only evidence connecting him to the crime."

(Doc. No. 1 at 40.)

Davis' argument is unpersuasive.  As set forth at length above, the jury in Davis'

trial was presented with a plethora of evidence regarding Avery's credibility.  Both

---

[18]  The hearing board findings are set forth as follows: "You claim that the officer
who you refuse to identify allowed the inmate to stand at your door and make threats.
The board talked with the officer in control one for the day the other inmate went to
court.  After the other inmate went through the security door he turned around and you
were standing in the window of the cell.  The escorting officer then took the other inmate
to be transported and did not allow him to stand there. The board could not find any
evidence to substantiate your claims on this incident."  (Doc. No. 12-8, Exh. 102.)

Detective Taliano and Avery testified at length regarding Avery's recantation during Lenworth Edwards' first trial after the State refused to pay Avery an additional $10,000 to testify.  The jury was also presented with evidence that Avery then changed his mind again, and testified at Lenworth Edwards' second trial that he lied when he recanted during Edwards' first trial and did, in fact, witness Blakely's assault and murder.  Defense counsel attacked Avery's credibility repeatedly through Davis' trial, eliciting testimony regarding Avery's changing story, the reward money he collected, and his history of drug dealing.  Based on its own thorough review of Davis' trial transcript, the Court can say with certainty that the jury heard a great deal of evidence and testimony regarding Avery's credibility and alleged lack thereof.

Davis claims, however, that no jury would have convicted him had Avery testified Rosenbaum knew he was lying and nevertheless pressured him to testify against Edwards.  The Court cannot agree.  Recantation testimony, particularly when it is belatedly submitted, is considered "of little value" and "viewed with great suspicion."  *See Carter v. Mitchell*, 443 F.3d 517, 539 (6th Cir. 2006) (and cases cited therein).  *See also Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring)) (holding the petitioner had failed to demonstrate a credible claim of actual innocence "under the demanding *Schlup* standard" given that "recanting affidavits are always viewed with 'extreme suspicion'" and "new statements from witnesses years after the crime are inherently suspect" and "are to be viewed with a 'degree of skepticism' "); *Byrd v. Collins*, 209 F.3d 486, 508 n. 16 (6th Cir. 2000)("'Recanting affidavits and witnesses are viewed with extreme suspicion by the courts.'")(quoting *Spence v. Johnson*, 80 F.3d 989, 997 (5th Cir.1996)); *Gray v. Hudson*,  2008 WL 1995362, at *7 (N.D. Ohio May 5, 2008)

(Boyko, J.)(stating that "the inherent suspiciousness of the recanting affidavits [of prosecution witnesses] coupled with their late filing more than three years after conviction and the lack of explanation as to why they were filed so late" failed to demonstrate "new reliable evidence" of the petitioner's actual innocence); *Cleveland*, 65 F.Supp.3d at 523 ("[A] recantation must be looked upon with the utmost suspicion")(quoting *Ortega v. Duncan*, 333 F.3d 102, 107 (2nd Cir. 2003)).   This is particularly so where a "recantation is repudiated and a new one substituted."  *Campbell v. Curtis*, 2008 WL 4104346 at *6 (E.D. Mich. Aug. 29, 2008) (quoting *U.S. v. Brown*, 417 F.Supp. 340, 343 (E.D. Pa. 1976)).

        Had Avery changed his story yet again and testified consistent with his 2006 recantation affidavit during Davis' trial, the jury would have been presented with nothing more than additional evidence of Avery's tendency to change his story.  Davis has not persuaded the Court that this additional evidence would have been sufficient to cause the jury to find him not guilty.  This is so, not only because of the inherent suspiciousness of recantation testimony generally and Avery's specific history of recanting, but also because Avery's initial eyewitness account to police was corroborated by physical evidence in the record.  Indeed, Detective Taliano explained he did not simply rely on Avery's word when Avery gave his eyewitness account of Blakely's assault and murder.  Rather, Taliano testified, at length, that he found Avery's eyewitness account credible because it was consistent with other information the detectives had collected that Avery "couldn't possibly have gotten from either the street or any reports that may or may not have been in the papers."  (Doc. No. 12-6 at Tr. 278.)  By way of example, Taliano explained he believed Avery because Avery stated Blakely had struck Lenworth Edwards

58

in the face during the struggle in Epps' apartment, and Edwards had covered his face and backed off.  Taliano felt this was consistent with the analysis of the blood on Edwards' jacket, which had previously been provided to police by Delphenia Guice.[19] The blood analysis, both Taliano and Laux testified, revealed that the blood stain on the jacket was a match to Lenworth Edwards and, further, that the angle in which the blood reached the jacket (*i.e.*, straight down from above) was consistent with a nosebleed.  (*Id.* at Tr. 82-83, 278.)

Taliano provided other examples as well.  He testified Avery's statement that Blakely was dragged through a grassy, leaf covered area was consistent with the fact that a piece of leaf or "grassy substance" was found attached to Blakely's body during the autopsy.  (*Id.* at Tr. 279.)  Taliano further testified that the numerous cuts to Blakely's body were consistent with Avery's eyewitness account of her murder:

> Q:    I would like to direct your attention to State's Exhibits 2-G, 2-H, and 2-F, and specifically to the small puncture wounds that were described by Dr. Buchanan.
>
> A:    Yes, sir.
>
> Q:    Did those exhibits in any corroborate what William Avery, Jr. told you occurred after he had admitted he was present behind the Westgate Plaza?
>
> A:    Yes.

---

[19] The Court is aware that Ms. Guice executed an affidavit in October 2005, in which she asserts that (1) Cleveland was in New York at the time Blakely was murdered; and (2) her testimony at Cleveland's trial was coerced by the prosecution as she had been "constantly threatened and harassed" by Detective Taliano.  *See Cleveland v. Bradshaw*, 65 F.Supp.3d 499, 522 (N.D. Ohio 2014) (Zouhary, J.)  Judge Zouhary found Ms. Guice's statement to be "wholly unreliable."  *Id.* at 523.  Regardless, Ms. Guice's 2002 statement has no bearing on the forensic DNA analysis of the blood stains on Edwards' jacket.

Q:    And how so?

A;    William Jr. had indicated to us that when he arrived, he saw the
      person he believes or knows to be Justice with a shiny object in his
      hand, and he believed Marsha Blakely was on the ground between
      two parked vehicles and that he saw this person he identified as
      Justice swinging this thing in a downward motion, this shiny object
      in a downward motion towards the direction of Marsha Blakely.  The
      autopsy indicated that she had between 20 and 25 small puncture
      wounds to the right side and back of her neck, and none being
      lethal but nonetheless, you know, extreme pain would have been
      the result of that.

Q:    Do these– are these torture type wounds consistent with William
      Avery, Jr.'s account of one of the members of this drug ring
      inquiring of her, "Where is my shit?" or interrogating her?

A:    Yes, sir.

(*Id.* at Tr. 281-282.)  Finally, Taliano testified that Avery's eyewitness account was

consistent with the behavior of Davis, Cleveland, Lenworth Edwards, and John Edwards

after Blakely's body was found.  (*Id.* at Tr. 283-284.)  Specifically, Taliano testified that

his investigation revealed these individuals "immediately attempted to leave the area"

(*i.e.*, Lorain) after Blakely's body was discovered.  (*Id.* at Tr. 283.)

Even if Avery recanted again in Davis' trial and testified that Rosenbaum had

pressured him to testify in Edwards' second trial, this would not have had any impact on

the corroborating evidence identified by Taliano and presented to the jury.[20]  In light of

---

[20] In his Traverse, Davis argues this corroborating evidence does not support
Avery's trial testimony because "there was ample opportunity for police to provide him
with information about the crime scene before his September 11 statement."  (Doc. No.
17 at 26-27.)  Davis then recites a series of situations where Avery could, hypothetically,
been provided with information regarding the crime scene prior to his initial statement to
police.  (*Id.*)  Davis' argument is entirely speculative and rejected.  He has not directed
this Court's attention to any evidence indicating that Avery was, in fact, provided with
non-public information about the crime scene before his initial interview with Detectives
Taliano and Resendez.

60

this corroborating evidence, Davis has not demonstrated by clear and convincing evidence that "no reasonable factfinder would have found him guilty."[21]  28 U.S.C. §2244(b)(2)(B)(ii).

This conclusion is further supported by the fact that Avery's 2006 recantation affidavit is itself suspect.  In his affidavit, Avery states that, during his September 11, 1991 interview with police, "they showed me pictures of an apartment which they said was Floyd Epps' and asked me to describe what happened in the apartment. I then made up a story of what happened in the apartment, based upon the pictures."  (Doc. No. 12-3 at Exh. 55, Page ID# 1155.)  However, Taliano clearly testified that, although he and Resendez first visited Epps' apartment on August 9, 1991, they did not take photographs of the apartment until September 18, 1991, one week *after* Avery gave his initial statement to police.  (*Id.* at Tr. 257, 289.)  While Davis doubts that police would not have photographed Epps' apartment sooner, Taliano explained at trial that he was not aware Epps' apartment was a crime scene until Avery told police on September 11, 1991 that Blakely had been assaulted there prior to her murder.  It was only after Avery's initial statement, Taliano explained, that he and Resendez returned to Epps' apartment, not

---

[21] The parties spend a great deal of time arguing about the veracity of Avery's initial statement to police that a table was overturned in Epps' apartment during the assault on Blakely on August 8, 1991.  The Court does not find this issue to be material. The evidence presented at Davis' trial indicates Epps' apartment was unlocked during the early morning hours of August 8, 1991, allowing for the possibility that other individuals could have entered the apartment.  Indeed, evidence presented at Davis' trial indicates that several individuals did, in fact, enter Epps' apartment during the early morning hours of August 8, 1991.  Moreover, one of these individuals (Leonard Walker) observed the table in question laying on its side, as described by Avery.  (Doc. No. 12-6 at Tr. 366-367, 379-380; 349-350, 359.)  Regardless of this issue, however, the Court finds the other corroborating evidence described above sufficient to support Avery's trial testimony.

only to take photographs, but also to have it processed for possible blood or fiber samples.[22]  (*Id.* at Tr. 289-291.)

The Court further finds the Lorain County Jail Investigation Reports, even when considered in combination with Avery's 2006 recantation affidavit, do not support Davis' argument.  Davis characterizes these Reports as demonstrating that "Avery, Jr. fabricated his story: he was never threatened by Lenworth Edwards, and thus that did not explain why he recanted in Edwards' trial."  (Doc. No. 1 at 54.)  He further argues the Reports demonstrate Avery had no "external reason" to recant and, therefore, the jury "would have believed the recantation rather than his trial testimony, which was motivated by money and pressure from the prosecutor." (*Id.* at 55-56.)

The Court does not interpret the Jail Investigation Reports as undermining Avery's testimony that he was threatened by Lenworth Edwards.  Avery testified he encountered Edwards in the hallway before the holding cells, in the Lorain County Jail.  (Doc. No. 12-6 at Tr. 161-163.)  He claimed Edwards made a motion like he was slitting his throat and pointed at Avery.  (*Id.*)  This testimony is not inconsistent with the December 23, 1991 Hearing Board Report.  Indeed, that Report expressly found that (1) "when Edwards was brought up for court he went through Door 151 and Inmate Avery was standing in the window of the door;" and (2) "Inmate Edwards then turned around after the door closed and was saying something to Inmate Avery."  (Doc. No. 12-8, Exh. 102.)  Although the Report found no basis for Avery's accusations that corrections officers allowed Edwards

---

[22]  Taliano's testimony at Davis' trial on this issue is fully consistent with his testimony at the December 2013 evidentiary hearing before Judge Zouhary in the Cleveland case.  (Doc. No. 12-4 at Tr. 258.)

to threaten him, the Report's findings regarding the encounter between Edwards and

Avery at the Jail are substantially consistent with Avery's testimony at trial that he was

threatened by Edwards.  Thus, the Court finds the December 1991 jail investigation

documents do not support Davis' argument and would not have changed the outcome of

the trial.

Accordingly, and for all the reasons set forth above, the Court finds Davis has

failed to demonstrate that the facts underlying his claims in Grounds One, Two and Four,

if proven and viewed in light of the evidence as a whole,[23] would be sufficient to establish

that, but for constitutional error, no reasonable factfinder would have found him guilty of

the underlying offense, pursuant to 28 U.S.C. § 2244(b)(2)(B)(ii).[24]  The Court, therefore,

---

[23]  As noted above, in conducting this inquiry, the Court did not consider Abdullah's August 1991 statement to police because the Sixth Circuit did not authorize Davis to present that claim in his successive petition.  Although Davis argues at length regarding the importance of the Abdullah statement, the Court agrees with Judge Zouhary's finding in *Cleveland* that it is not particularly compelling.  As Judge Zouhary explained: "Abdullah did not witness Blakely's murder, and the statement he gave police is not exculpatory because Abdullah had no direct knowledge about who killed Blakely. At best it suggests Blakely may have encountered two additional men the evening of the murder.  Further, Abdullah also implicated the New York drug dealers in the events surrounding Blakely's last hours when he reported that Blakely had stolen crack cocaine from John Edwards.  Had Abdullah testified at trial, the jury would have been presented with two competing stories from two individuals with credibility issues– Abdullah and Avery.  But, Avery's claim that he witnessed the murder had corroborating physical evidence.  Of note, Abdullah testified at the trial of John Edwards (as did Avery), and Edwards was convicted." *Cleveland v. Bradshaw*, 65 F.Supp.3d 499 (N.D. Ohio Dec. 12, 2014) (Zouhary, J.)

[24] The Court recognizes that, in *Cleveland v. Bradshaw*, 693 F.3d 626 (6th Cir. 2012), the Sixth Circuit found Avery's 2006 recantation affidavit constituted "new, reliable" evidence for purposes of the actual innocence exception to the habeas statute of limitations.  In reaching that conclusion, however, the Sixth Circuit applied the actual innocence standard set forth in *Schlup*, which is different from and less demanding than the actual innocence standard set forth in § 2244(b)(2)(B)(ii).  Moreover, when the Sixth Circuit made this determination regarding the reliability of Avery's affidavit in 2012, the

does not have jurisdiction to consider Grounds One, Two, and Four and they should be denied on that basis.

## V. Statute of Limitations

Even assuming Davis successfully demonstrated that Grounds One, Two and Four met the requirements of 28 U.S.C. § 2244(b)(2)(B)(ii), Respondent argues the petition should nevertheless be dismissed as untimely. The Court agrees.

In the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (April 24, 1996), Congress enacted a period of limitations for the filing of habeas petitions. The statute provides, in relevant part:

> (d)(1) A one year period of limitations shall apply to the filing of an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

---

Circuit did not have the benefit of the information and testimony obtained as part of the evidentiary hearing conducted before Judge Zouhary on remand in December 2013. After carefully reviewing the testimony and evidence adduced at that hearing, Judge Zouhary concluded Avery's 2006 recantation was not reliable for a variety of reasons, including the fact that the physical evidence corroborated Avery's trial testimony. *See Cleveland v. Bradshaw*, 65 F.Supp.3d 499 (N.D. Ohio Dec. 12, 2014) (Zouhary, J.) As noted *supra*, the Sixth Circuit declined to issue a COA in that case. *See Cleveland v. Bradshaw*, Case No. 15-3029 (6th Cir. Feb. 24, 2016).

64

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1) & (2).

### 1.    Statutory Tolling

In the case at bar, Respondent argues Davis' "permitted claims" (i.e., Grounds One, Two and Four) are time-barred because Davis did not file his successive habeas petition within the one-year limitations period.  (Doc. No. 12 at 40.)  She notes that Davis maintains he did not become aware of either Avery's 2006 recantation affidavit or the Jail Investigation Reports until November 2011.  Relying on § 2244(d)(1)(D), Respondent argues that "[g]iving Davis every benefit of the doubt that he discovered the factual predicate(s) for his claims through the exercise of due diligence by November 30, 2011, these claims are still time-barred." (*Id.* at 41.)  Specifically, she claims the one year limitations period expired on November 30, 2012 and would not have been tolled by Davis' June 2012 Motion for Leave to file Delayed Motion for New Trial because that motion was not "properly filed."  As Davis did not file his successive petition until August 2013, Respondent argues it is nearly nine months late and should be dismissed as untimely.

Davis acknowledges the limitations period began to run on November 30, 2011, after his discovery of Avery's recantation and the Jail Investigation Report.  (Doc. No. 17 at 68.)  He claims, however, that his petition is timely because the limitations period was statutorily tolled by his Motion for Leave to file Delayed Motion for New Trial.  (*Id.*)

The AEDPA tolls the one-year limitations period during the time "'a properly filed application for State postconviction or other collateral review . . . is pending.' § 2244(d)(2)." *Evans v. Chavis*, 546 U.S. 189, 191 (2006); *Carey v. Saffold*, 536 U.S. 214 (2002); *accord Matthews v. Abramajtys*, 319 F.3d 780, 787 (6th Cir. 2003).  "The time that an application for state post-conviction review is 'pending' includes the period between (1) a lower court's adverse determination, and (2) the prisoner's filing of a notice of appeal, provided that the filing of the notice of appeal is timely under state law." *Id.*

Only "properly filed" applications for post-conviction relief or collateral review toll the statute of limitations, and "a state post-conviction petition rejected by the state court as untimely is not 'properly filed' within the meaning of § 2244(d)(2)." *Allen v. Siebert*, 552 U.S. 3, 128 S. Ct. 2, 3 (2007); *Pace v. DiGuglielmo*, 544 U.S. 408, 125 S.Ct. 1807 (2005) ("time limits, no matter their form, are 'filing' conditions, and a state postconviction petition is therefore not 'properly filed' if it was rejected by the state court as untimely"); *Monroe v. Jackson*, 2009 WL 73905, *2 (S.D. Ohio Jan. 8, 2009).  If a state court ultimately denies a petition as untimely, that petition was neither properly filed nor pending and a petitioner would not be entitled to statutory tolling.  *See Monroe* at *2; *Thorson v. Palmer*, 479 F.3d 643, 645 (9th Cir. 2007).

 Here, Davis filed his *pro se* "Motion for leave to file delayed motion for new trial pursuant to Crim. R. §33(A) and Ohio Rev. Code §2945.79(F)" in the state trial court on June 12, 2012.  (Doc. No. 12-3, Exh. 55.)  The trial court summarily denied Davis' motion on June 21, 2012.  (*Id.* at Exh. 56.)  Davis appealed, and the state appellate court affirmed on March 11, 2013.  (*Id.* at Exhs. 57, 58, 61.)  In its Decision and Journal Entry, the state appellate court found as follows:

{¶ 7} Pursuant to Crim.R. 33(A)(6), a new trial may be granted on the motion of the defendant "[w]hen new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial."  Further, Crim.R. 33(B) states, in relevant part, that if the basis of the motion is newly discovered evidence, it:

> shall be filed within one hundred twenty days after the day upon which the verdict was rendered[.]  If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the [trial] court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

(Emphasis added.)  Additionally, "'[c]lear and convincing proof requires more than a mere allegation that a defendant has been unavoidably prevented from discovering the evidence he seeks to introduce as support for a new trial.'"  *State v. Gilcreast*, 9th Dist. No. 26311, 2013–Ohio–249, ¶ 4, quoting *State v. Covender*, 9th Dist. No. 07CA009228, 2008–Ohio–1453, ¶ 6, quoting *State v. Mathis*, 134 Ohio App.3d 77, 79 (1st Dist.1999), overruled on other grounds.  Finally, "[u]navoidable delay results when the party had no knowledge of the existence of the ground supporting the motion for a new trial and could not have learned of the existence of that ground within the required time in the exercise of reasonable diligence."  *Covender* at ¶ 14, quoting *State v. Rodriguez–Baron,* 7th Dist. No. 12–MA–44, 2012–Ohio–5360, ¶ 11.

{¶ 8} Here, Mr. Davis moved for leave to file a delayed motion for a new trial based upon newly discovered evidence approximately 18 years after the verdict was rendered in this matter.  In his motion, Mr. Davis stated that he was unavoidably prevented from discovering the new evidence because: (1) his trial counsel intentionally suppressed and/or withheld the AT&T telephone records, and (2) the State intentionally withheld and/or suppressed the county jail's investigative report with regard to whether the State's witness, William Avery, Jr., was threatened by a co-defendant in this case.  Also, according to Mr. Davis' affidavit, he obtained the AT&T telephone records in October of 2011, by filing a request with the clerk of the Supreme Court of New York County, and he received the jail's investigative report from a codefendant in November of 2011.

*State v. Davis*, 2013 WL 936241 at * 2.  The state appellate court first found Davis was

aware of the AT&T phone records during his 1994 trial and "we see nothing to indicate that

67

he could not have requested the records within one hundred and twenty days after the verdict was rendered." *Id*.  The court then explained as follows:

> {¶ 10} Although "Crim.R. 33(B) does not provide a specific time limit for the filing of a motion for leave to file a delayed motion for new trial [,] * * * Ohio courts have adopted a reasonableness standard."  *State v. Cleveland*, 9th Dist. No. 08CA009406, 2009–Ohio–397, ¶ 49.  "If there has been an undue delay in filing the motion after the evidence was discovered, the trial court must determine if that delay was reasonable under the circumstances or that the defendant has adequately explained the reason for the delay." (Internal quotations omitted.)  *Id*.  In the present matter, Mr. Davis' motion and affidavit fail to provide clear and convincing proof as to why he was unavoidably prevented from discovering the telephone records in a timely manner.  Also, Mr. Davis provides no explanation as to why it was reasonable for him to wait an additional eight months to file his motion for leave after obtaining the telephone records.
>
> {¶ 11} Second, the record indicates that Mr. Davis acquired both the jail investigative report, and Mr. Avery's affidavit recanting his trial testimony in November of 2011.  Although the jail investigative report is dated December 23, 1991, and Mr. Avery's affidavit was signed in February of 2006, Mr. Davis claims that he did not obtain this evidence until 2011.  **Mr. Davis does not provide clear and convincing proof as to why he was unavoidably prevented from discovering this evidence in a timely manner.  Further, Mr. Davis waited an additional seven months after discovering this evidence to file his motion for leave.  Again, Mr. Davis provides no explanation regarding the reasonableness of his actions in waiting seven additional months to file his motion.**

*Id.* at * 3 (emphasis added).  Accordingly, the court found Davis did not meet his burden of providing clear and convincing proof that he was unavoidably prevented from discovering this evidence within the requisite time frame after the verdict was rendered, or that he filed his motion for leave to file a delayed motion for new trial within a reasonable time after obtaining the newly discovered evidence.  *Id*.  Therefore, the court concluded the trial court did not abuse its discretion in denying Davis' motion for new trial without a hearing.  *Id*.

68

Davis thereafter filed a *pro se* appeal in the Ohio Supreme Court.  (Doc. No. 12-3, Exhs. 62, 63.)  On June 26, 2013, the Ohio Supreme Court declined to accept jurisdiction pursuant to S.Ct. Prac. R. 7.08(B)(4).  (*Id.* at Exh. 65.)  Davis filed his successive application in the Sixth Circuit one month later, on August 22, 2013.  (*Id.* at Exh. 66.)

Respondent argues the limitations period was not statutorily tolled during the pendency of Davis' motion for leave to file delayed motion for new trial because the state courts denied that motion as untimely filed.  Davis disagrees.  He argues that, because he discovered Avery's 2006 recantation affidavit and the Jail Investigation Report more than 120 days after his verdict, he was required under Ohio Crim. R. 33(B) to file a motion for leave to file a motion for new trial.  Davis asserts he "complied with the rules and procedures governing filings, and his motion for leave was properly filed."  (Doc. No. 17 at 70.)  He further argues as follows:

> Though the Ohio court of appeals determined that Davis could have discovered the new evidence sooner and did not timely file his motion, the Sixth Circuit Court of Appeals reviewed the evidence and held that Davis made a showing that he was diligent.  As such, this Court should find that the Ohio court of appeals' decision was in error, and hold that the limitations period was tolled during the time Davis litigated his motion for leave to file a motion for new trial in state court, which was approximately one year.

(*Id.*)

Davis' argument is rejected.  Davis' motion for leave to file motion for new trial was clearly dismissed for untimeliness and, therefore, was not "properly filed" for purposes of §2244(d)(2).  *See e.g., Anderson v. Warden*, 2010 WL 1387504 at * 3 (N.D. Ohio March 9, 2010) (Gallas, M.J.).  Another district court within this Circuit confronted with a similar situation reached the same conclusion, finding as follows:

69

The warden contends that a Rule 33 motion for new trial constitutes a state post-conviction proceeding for purposes of § 2244(d)(2), and therefore does not toll the running of the period of limitation unless it is "properly filed." Anderson's motion was dismissed for untimeliness, and because of this, the warden correctly argues that it was not "properly filed." [footnote omitted] "Proper" filing includes "the time limits upon its delivery." *Artuz v. Bennett*, 531 U.S. 4, 8, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000); *Pace v. DiGuglielmo*, 544 U.S. 408, 414-17, 125 S.Ct. 1807, 1813-15,161 L.Ed.2d 669 (2005) (State post-conviction petition rejected by the state court as untimely is not "properly filed" within the meaning of § 2244(d)(2)); *Allen v. Siebert*, 552 U.S. 3,7, 128 S.Ct. 2, 3, 169 L.Ed.2d 329 (2007) (same); *Vroman v. Brigano*, 346 F.3d 598, 603 (6th Cir. 2003). The state courts are the arbiters of the state's time rules. *Vroman*, 346 F.3d at 603; *Israfil v. Russell*, 276 F.3d 768, 771 (6th Cir. 2001). Consequently, "[w]hen a postconviction petition is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)." *Allen v. Siebert*, 552 U.S. at 7, 128 S.Ct. at 4(quoting *Pace*, 544 U.S., at 414, 125 S.Ct. 1807, 1812, 161 L.Ed.2d 669 (quoting *Carey v. Saffold*, 536 U.S., 214, 226, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002) (alteration in original)).

*Anderson*, 2010 WL 1387504 at * 3. *See also Smith v. Smith*, 2010 WL 1416994 at * 2 (N.D. Ohio April 6, 2010) (Adams, J.) (holding that "Petitioner's motions for leave to file a motion for a new trial here were found to be untimely by the Ohio courts under Ohio R.Crim. P. 33" and "[t]hus, the motions were not 'properly filed' within the meaning of 28 U.S.C. § 2244(d)(2) and do not toll the statute of limitations.")

Moreover, the Court rejects Davis' argument that this Court should find the state appellate court erred in concluding his motion for leave to file motion for new trial was untimely. The Sixth Circuit's finding regarding diligence was made in the context of adjudicating Davis' application to file a successive habeas petition pursuant to §2244(b)(2). Davis cites absolutely no authority for the argument that the Sixth Circuit's ruling in this regard is grounds for essentially overruling a state court's finding of untimeliness in the context of Ohio Crim. R. 33. It is well-established that "[f]ederal courts are obligated to accept as valid a state court's interpretation of state law and rules of

70

practice of that state." *Vroman v. Brigano*, 346 F.3d 598, 603 (6th Cir. 2003).  Indeed, as another district succinctly stated, "[t]he state courts are the arbiters of the state's time rules." *Anderson*, 2010 WL 1387504 at *3.  Davis' argument to the contrary is without merit.

Accordingly, the Court finds Davis' motion for leave to file motion for new trial did not statutorily toll the limitations period under §2244(d).  Thus, the statute of limitations began to run on November 30, 2011 and expired one year later, on November 30, 2012.  As Davis did not file his successive application in the Sixth Circuit until August 22, 2013, his petition is nine months late.  Accordingly, unless equitable tolling is appropriate, his petition should be dismissed as time-barred.

### 2.    Equitable Tolling

"AEDPA's limitations period is subject to equitable tolling, a doctrine that 'allows courts to toll a statute of limitations when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" *Hall v. Warden, Lebanon Correctional Inst.*, 662 F.3d 745, 749 (6th Cir. 2011) (*quoting Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010)).  In *Hall*, the Sixth Circuit expressly found that equitable tolling should be used only "sparingly" and only if the petitioner establishes (1) that he has been pursuing his rights diligently, *and* (2) that some extraordinary circumstance stood in his way preventing timely filing.  *Hall*, 622 F.3d at 749 (*citing Holland v. Florida*, 560 U.S. 631, 130 S. Ct. 2549 (2010)).

Respondent argues Davis is not entitled to equitable tolling because he was not diligent in pursuing his rights, either in the state or federal courts.  She notes that, although Davis discovered Avery's 2006 recantation affidavit and Jail Investigation Reports in

November 2011, he did not file his successive habeas application until nearly two years later, in August 2013.  Moreover, Respondent argues Davis was not diligent in the state courts, emphasizing that he waited seven months after discovering the "new evidence" to file his June 2012 motion for leave to file motion for new trial.  (Doc. No. 12 at 44-46.)

Davis argues he exercised reasonable diligence, relying heavily on the fact that he was proceeding *pro se* when he filed his state court motion for new trial and successive habeas application.  (Doc. No. 17 at 72.)

The Court agrees with Respondent.  Davis did not pursue his rights diligently and is not entitled to equitable tolling.  Aside from noting that he was *pro se* during the relevant time, Davis offers no explanation for his seven month delay in filing his motion for leave to file motion for new trial.  Courts have found, however, that a petitioner's *pro se* status and limited law library access, standing alone, are not sufficient to constitute an extraordinary circumstance and to excuse a late filing.  *Hall*, 662 F.3d at 751-752.  *See also Keeling v. Warden*, 673 F.3d 452, 464 (6th Cir. 2012).

### 3.    Actual Innocence

With respect to untimely habeas petitions, the United States Supreme Court has held that there is an "actual innocence" gateway exception and "[t]o invoke the miscarriage of justice exception to AEDPA's statute of limitations ... a petitioner 'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1935, 185 L. Ed.2d 1019 (2013) (noting that a claim of actual innocence is not a request for equitable tolling but, rather, a request for an equitable exception to § 2244(d)(1)) (citations omitted).  For the actual innocence exception to apply, a petitioner must "support his allegations of constitutional

72

error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995).

The Court finds Davis has failed to demonstrate he is entitled to the actual innocence exception to § 2244(d)(1).  Even under the less stringent standard set forth in *Schlup* (as opposed to that applied in the context of §2244(b)(2)(B)(ii)), Davis has failed to demonstrate actual innocence.  For all the reasons set forth in Section IV.D.1.c of this Report & Recommendation, the Court finds Davis has failed to support his allegations of constitutional error with "new reliable evidence."  As discussed exhaustively *supra*, Avery's 2006 recantation affidavit is neither reliable nor trustworthy, and the Jail Investigation Reports do not undermine Avery's credibility, as suggested by Davis.  Accordingly, the Court finds Davis has failed to show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1935, 185 L. Ed.2d 1019 (2013).[25]

---

[25]  Although the Sixth Circuit found Cleveland presented a credible claim of actual innocence entitling him to equitable tolling of the statute of limitations, this Court is not bound by that determination in the instant case.  The Sixth Circuit based its determination in *Cleveland* on the cumulative effect of four distinct pieces of evidence: (1) Avery's 2006 recantation affidavit; (2) an affidavit from forensic scientist Larry Dehus indicating that Blakely's blood was found on a piece of rubber at the Epps murder scene; (3) the affidavit of David Donaphin that he encountered Cleveland in New York between 10 p.m. and 12 midnight on August 7, 1991; and (4) flight records from New York City to Cleveland, Ohio.  The Dehus affidavit and flight records are not at issue in the instant case, however, and have no bearing on the instant dispute.  Moreover, the Sixth Circuit did not authorize this Court to consider the Donaphin affidavit and, in any event, it bears little direct relevance to Davis.  Finally, although the Sixth Circuit found Avery's 2006 recantation affidavit to be reliable, it did not have before it the testimony and evidence developed at the 2013 evidentiary hearing before Judge Zouhary.  This Court, having reviewed all the evidence including the transcript of the 2013 evidentiary hearing, agrees with Judge Zouhary that Avery's 2006 recantation affidavit is not

The Court, therefore, finds Davis is not entitled to the actual innocence exception to §2244(d)(1).  Accordingly, it is recommended the Court find that Davis' petition is time-barred under 28 U.S.C. §2244(d)(1).

## VI.  Exhaustion and Procedural Default

In the alternative, Respondent argues Grounds One, Two and Four are procedurally defaulted due to Davis' failure to comply with the requirements of Ohio Rule of Crim. P. 33(B).  (Doc. No. 12 at 50-58.)   Davis disagrees, arguing his claims are not defaulted because (1) the state courts improperly applied a procedural bar to Davis' June 2012 motion for leave to file delayed motion for new trial; and (2) Ohio does not have a "firmly established and regularly followed" procedural rule governing the timeliness of delayed new trial motions.  (Doc. No. 17 at 78-85.)  Davis further argues that, even if the Court were to find his claims procedurally defaulted, he can show cause and prejudice to excuse the default.  (*Id.*) Finally, Davis asserts he is actually innocent and that his innocence is "a gateway through which he may pass and have his claims considered on the merits."  (*Id.* at 85-87.)


### A.    Legal Standard

A state prisoner must exhaust all available state remedies or have no remaining state remedies available prior to seeking review of a conviction via federal habeas corpus.  *See* 28 U.S.C. § 2254(b) and (c); *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. McMackin*, 935 F.2d 790, 793 (6th Cir. 1991).  The exhaustion requirement is properly

---

reliable.  Thus, and for all the reasons set forth above, the Court concludes Davis has not presented a credible claim of actual innocence for purposes of §2244(d)(1).

satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on all the petitioner's claims.  *See Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990).  If any state procedures for relief remain available, the petitioner has not exhausted his state remedies, and, generally, a federal court must dismiss his petition.  *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Where, however, there are no longer any state court remedies still available to a petitioner with respect to a particular claim, this Court may deem that claim procedurally defaulted. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' *Engle v. Isaac*, 456 U.S. 107, 125, n.28 (1982), it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law,' *Castille*[, 489 U.S. at 351].").

Generally, a federal court must decline to review  "contentions of federal law . . . not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure."  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). When a petitioner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

If the State argues that a petitioner has procedurally defaulted a claim, the Court must conduct a four-step analysis to determine whether the petitioner has indeed

defaulted and, if so, whether the procedural default may be excused:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction.  . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . . This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims. . . . [Fourth, if] the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

"Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Objective impediments include an unavailable claim or interference by state officials that made compliance with state procedural rules impracticable.  *Murray*, 477 U.S. at 488.  To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).  *See also Group v. Robinson*, ---- F.Supp.3d ----, 2016 WL 254872 at * 11 (N.D. Ohio Jan. 20, 2016) (Zouhary, J.)  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice."  *See Coleman v. Thompson, 501 U.S. 722, 749-50 (1991)*.  Conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial."  *Schlup v. Delo, 513 U.S. 298, 324 (1995)*.

**B.     Application to Grounds One, Two and Four**

Respondent asserts Grounds One, Two and Four are procedurally defaulted because the state courts determined Davis' delayed motion for new trial was untimely under Ohio Rule Crim. Pr. 33 ("Crim. R. 33.")  Crim. R. 33(B) requires motions for a new trial based on newly discovered evidence to be filed within 120 days after the verdict was rendered unless it can be demonstrated by clear and convincing evidence that the defendant was unavoidably prevented from discovering such evidence during that time period.[26]

The first two prongs of the *Maupin* test are clearly satisfied as Davis, by filing his motion for new trial approximately 18 years after the verdict was rendered, failed to comply with the 120 day time limit.  In addition, and as set forth *supra*, the state appellate court clearly enforced Crim. R. 33(B), the state procedural sanction, and expressly found that Davis' motion was untimely because he failed to demonstrate by clear and convincing evidence that he was unavoidably prevented from discovering the newly discovered

---

[26] Respondent also argues Davis did not fairly present Ground One to the state courts.  (Doc. No. 12 at 20-21.)   As the Court finds Grounds One, Two and Four to be defaulted for the reasons set forth *infra,* it need not address Respondent's fair presentation argument.

evidence supporting his motion in a timely manner.  *See State v. Davis*, 2013 WL 936241 at * 3.  The state appellate court also concluded Davis did not meet the state's "reasonableness" requirement because he waited an additional seven months after discovering the new evidence to file his motion for leave to file delayed motion for new trial.  *Id.*  The Ohio Supreme Court declined jurisdiction.[27]

Davis, however, argues the third *Maupin* factor is not met because Ohio does not have a "firmly established and regularly followed" procedural rule governing the timeliness of delayed new trial motions.  Rather, Davis asserts that "whether a defendant meets [the requirements of Crim. R. 33(B)] is simply up to the discretion of the trial judge," who applies a reasonableness standard.  (Doc. No. 17 at 80.)  Because enforcement of the rule is discretionary, Davis argues there is "no measurable manner by which to determine whether a motion for leave to file a new trial motion will be granted."  (*Id.* at 81.)

Another district court within this Circuit recently addressed, and rejected, a similar argument as follows:

> Petitioner asserts that the criteria under Rule 33(B) required for establishing that the filing of an untimely motion for new trial is warranted does not constitute an adequate and independent ground on which to foreclose relief, thus failing the third part of the *Maupin* test.
>
> Under the third prong of the *Maupin* analysis, "a federal court is generally barred from considering an issue of federal law arising from the judgment of a state court if the state judgment rests on a state-law ground that is both independent of the merits of the federal claim and an adequate basis for the

---

[27] This Court looks to the decision of the state appellate court rejecting Davis' motion for leave to file a delayed motion for new trial in order to determine whether the state courts enforced the procedural rule at issue.  *See Stone v. Moore*, 644 F.3d 342, 346 (6th Cir. 2011) ("In our procedural default inquiry, we look to the 'last explained state court judgment,' to determine whether relief is barred on procedural grounds") (quoting *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004)).

state court's decision."  *Stone v. Moore*, 644 F.3d 342, 345 (6th Cir. 2011) (internal quotations and citations omitted).  "To qualify as an 'adequate' procedural ground, a state rule must be "firmly established and regularly followed."  *Walker v. Martin*, —— U.S. ——, ——, 131 S.Ct. 1120, 1127, 179 L.Ed.2d 62 (2011) (citations omitted).  The Supreme Court has held that a "rule can be 'firmly established' and 'regularly followed,' ... even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  *Id.* at 1128 (internal quotations and citations omitted).

Other federal courts have rejected Petitioner's argument that the time requirements under Rule 33 of the Ohio Rules of Criminal Procedure fail the third part of the *Maupin* test, and Petitioner has cited no basis for this Court to conclude otherwise.

> Ohio has a relevant procedural rule—a delayed motion for new trial must be supported by clear and convincing evidence that the ground for the new trial could not have been discovered in the exercise of reasonable diligence.  Ohio R.Crim. P. 33(B).  That rule was enforced ... in this case by the Ohio courts.  The Warden cites ample authority from this Court holding that this rule is an adequate and independent state ground of decision.  (Supplemental Return, Doc. No. 43, PageID 1485, citing *Rigdon v. Ohio Adult Parole Authority*, No. 1:08cv716, 2010 WL 3910236, at *12 (S.D. Ohio July 7, 2010), adopted, 2010 WL 3910230 (S.D. Ohio Oct.4, 2010); and *Carson v. Hudson*, No. 2:07–cv–00375, 2009 U.S. Dist. LEXIS 1714, at *63, 2009 WL 33367 (S.D. Ohio Jan.5, 2009), adopted, 2009 U.S. Dist. LEXIS 32578, 2009 WL 1010639 (S.D. Ohio Apr.14, 2009)).  *Moore v. Brunsman*, No. 3:08cv2895, 2010 WL 425055, at *1, 14–15 (N.D. Ohio Jan.26, 2010), from the Northern District is to the same effect.

*Minor v. Brunsman*, No. 1:08–cv–583, 2014 WL 1276582, at *14 (S.D.Ohio March 27, 2014); *see also Anderson v. Warden*, No.2010 WL 1387504, at *8–9 (N.D. Ohio March 9, 2010) (the requirement for the granting of an untimely motion for new trial does not allow the state courts "unfettered discretion" in enforcement of the rule and constitutes an adequate and independent ground on which to foreclose federal habeas corpus review); *Moore v. Brunsman*, No. 08–cv–2895, 2010 WL 425055, at *15 (N.D. Ohio Jan.26, 2010) (concluding that "the timeliness requirement of Rule 33 is a firmly established Ohio procedural rule capable of providing the basis for a finding of procedural default in a federal habeas matter.")

*Veliev v. Warden, Chillicothe Correctional Institution*, 2014 WL 4805292 at * 11-12 (S.D.

79

Ohio Sept. 26, 2014).  *See also* *Petrone v. Bunting*, 2015 WL 9918661 at * 9-10 (N.D. Ohio December 10, 2015) (White, M.J.) (citing the above and concluding that "[t]his Court agrees with the above cases and finds that Ohio Crim. R. 33 constitutes an adequate and independent state law ground foreclosing federal habeas relief"); *Ambartsoumov v. Warden, Chillicothe Correctional Inst.*, 2014 WL 4805384 at * 9-10 (S.D. Ohio Sept. 26, 2014); *Anderson v. Warden*, 2010 WL 1387504 at * 9-10 (N.D. Ohio March 9, 2010) (Gallas, M.J.).

Davis does not cite any contrary authority, nor does he offer any argument distinguishing the above cases from the instant matter.  Upon review, the Court agrees with the analysis set forth in *Veliev* and concludes that Ohio Crim. R. 33 constitutes an adequate and independent state law ground foreclosing federal habeas relief, satisfying the third prong of *Maupin*.

Alternatively, Davis maintains the state court "improperly applied" the procedural bar to his delayed motion for new trial.  (Doc. No. 17 at 78.)  He argues that he, in fact, satisfied Crim. R. 33(B)'s "reasonableness" standard because he "could not have discovered the new evidence, specifically, Avery's affidavit and the jail report, within 120 days of conviction."  (*Id.* at 79.)  Davis further asserts that the delay between his discovery of the new evidence and the filing of his motion was reasonable, arguing the delay was "attributable to him being a *pro se* litigant, and was a result of the obstacles he faced in drafting a motion for leave."  (*Id.* at 80.)

The Court rejects this argument.  As the Southern District explained in *Veliev*, "[a]bsent 'extreme circumstances' where it appears that the state court's interpretation is 'an obvious subterfuge to evade consideration of a federal issue,' this Court is bound by

the state courts' definition of its own rules."  *Veliev*, 2014 WL 4805292 at * 13.  Davis has not shown that the state appellate court's application of Rule 33 is outside of the norm or contrary to the holdings of the Ohio Supreme Court, particularly in light of the lengthy seven month delay between his discovery of the new evidence and the filing of his delayed new trial motion.

Accordingly, the Court finds Davis' first, second and fourth grounds are procedurally defaulted and should be dismissed on that basis, unless he can establish cause and prejudice to excuse the default.

Davis asserts he can establish both cause and prejudice.  With respect to cause, Davis argues "the State's concealment of the jail report and Avery's pre-trial recantation caused Davis' delay in discovering the evidence that supported his motion for leave filed in state court and his first, second, and fourth grounds for relief."  (Doc. No. 17 at 83.) With respect to prejudice, Davis argues the "[h]ad the jury been aware of the substantial cache of evidence undermining Avery's testimony, it would not have convicted Davis." (*Id.* at 85.)

Even assuming for the sake of argument that Davis could establish cause, his claims are nevertheless defaulted because the Court finds he cannot establish prejudice to excuse the default.  As discussed at length in Section IV.D.1.c of this Report & Recommendation, Avery's 2006 recantation affidavit is neither reliable nor trustworthy, and the Jail Investigation Reports do not undermine Avery's credibility, as suggested by Davis.  Accordingly, the Court finds Davis has failed to show that the alleged non-disclosure of this evidence "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Frady*, 456 U.S. at 170.  *See also*

81

*Group*, ---- F.Supp.3d ----, 2016 WL 254872 at * 11.

Finally, the Court finds Davis has failed to demonstrate actual innocence.  As noted above, even under the less stringent standard set forth in *Schlup* (as opposed to that applied in the context of §2244(b)(2)(B)(ii)), Davis has failed to demonstrate actual innocence.  Again, for all the reasons set forth in Section IV.D.1.c of this Report & Recommendation, the Court finds Davis has failed to support his allegations of constitutional error with "new reliable evidence."  Accordingly, the Court finds Davis has failed to show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."' *Schlup*, 513 U.S. at 327.

Therefore, it is recommended that the Court find Davis' first, second, and fourth grounds for relief should be dismissed as procedurally defaulted.

## VII. Conclusion.

Accordingly, and for all the reasons set forth above, Davis' successive petition should be DENIED for the following reasons: (1) Davis failed to meet the statutory standards set forth in 28 U.S.C. §2244(b)(2)(B)(ii); (2) the petition is time-barred under 28 U.S.C. §2244(d)(1); and (3) Davis' claims are procedurally defaulted.

Date: June 16, 2016                     /s/ *Nancy A. Vecchiarelli*
                                        United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served**

with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.