**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Ian Davis, | ) | CASE NO. 1:14 CV 2854 |
| aka Benson Davis, | ) | |
| Petitioner, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| Margaret Bradshaw, Warden, | ) | Memorandum of Opinion and Order |
| | ) | |
| Respondent. | ) | |

**Introduction**

This matter is before the Court [1] upon the Report and Recommendation of Magistrate

Judge Vecchiarelli (Doc. 43) which recommends denial of the Petition for Writ of Habeas

Corpus pending before the Court.  Petitioner filed objections to the recommendation.

Respondent did not file a response to the objections.  For the following reasons, the Report

and Recommendation is ACCEPTED.

_____

[1]     This matter was previously assigned to Judge Christopher Boyko who recused
himself after the Magistrate Judge issued this Report and Recommendation and
the petitioner filed objections.  This Court was then assigned to the case on
October 6, 2016.

1

**Standard of Review**

Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts provides, "The judge must determine *de novo* any proposed finding or recommendation to which objection is made.  The judge may accept, reject, or modify any proposed finding or recommendation."

**Facts**

Petitioner is incarcerated following his 1994 conviction by a jury for felonious assault and aggravated murder.  The Magistrate Judge has set forth the background and procedural facts which are incorporated herein.  The present petition is a successive petition authorized by the Sixth Circuit based on petitioner's claims stemming from witness William Avery's alleged perjury at trial.  The Court will briefly summarize the pertinent facts.

Petitioner's conviction for the August 8, 1991 assault (which began in the apartment of Floyd Epps[2]) and murder of Marsha Blakely was based in part on the testimony of William Avery, Jr. who had changed his story on several occasions.[3]  Avery also implicated Alfred

---

[2]   Epps's body was also discovered on August 8, 1991, about a quarter mile away from Blakely's body.  Blakely and Epps were friends, and Blakely often stayed at Epps's apartment.

[3]   Briefly, about a month after the murders, reward money was offered because the case had stymied. Avery's father, who had previously worked as a police informant, came forward saying he had information.  Detective Taliano told him he wanted an eyewitness. The next day, Avery came forward and gave his initial statement to Taliano saying that he was a witness to the beating in the apartment. He implicated petitioner, Alfred Cleveland, Lenworth Edwards, and John Edwards. On the day of Lenworth Edwards's trial in 1991, Avery refused to testify unless given $10,000. When the prosecutor refused, Avery would not testify and was jailed in contempt. He then returned to the courtroom and recanted his statement. A motion for mistrial was granted. At Edwards's second trial, Avery testified that his original statement implicating Edwards was true and he

2

Cleveland, Lenworth Edwards, and John Edwards. The conviction was affirmed on direct appeals wherein petitioner challenged the reliability of Avery.  Petitioner's first habeas petition, filed in 1998, was found to be time-barred. Petitioner filed a 1998 motion for new trial based on the newly discovered evidence of Jeremiah Charlton (aka Jeremiah Abdullah) who averred that two unidentified Hispanic men were responsible for Blakely's death. The motion was denied as untimely and affirmed on appeal. In June 2012, petitioner filed a *pro se* motion for leave to file a delayed motion for new trial in the state court wherein he first relied on the "newly discovered evidence" at issue here: (1) his own affidavit claiming innocence; (2) a copy of AT&T long distance phone records from New York to Lorain, Ohio dated June 27th to August 10th, that he claimed demonstrated he was in New York on the night of the murder; (3) a copy of a Lorain County Jail investigation report dated December 23, 1991 ("Jail Investigation Reports"[4]) regarding Avery's allegation that a corrections officer allowed Lenworth Edwards to threaten Avery in jail; and (4) Avery's 2006 affidavit recanting his former testimony that he witnessed Blakely's assault and murder.[5] This affidavit had been

---

had perjured himself during the first trial because Edwards had threatened him in jail.  This history was all part of petitioner's trial and Avery was examined and cross-examined regarding his prior change in testimony.

[4]      There are actually two reports- dated December 19 and 23, 1991- one an incident report and one a hearing board decision.

[5]      After his initial statement wherein he stated he witnessed the assailants beat Blakely unconscious and drag her from the apartment, a subsequent statement indicated that he also witnessed what resulted in her murder in an area behind Westgate Plaza.  Avery's 2006 affidavit contained the following averments:

At the trials of Al Monday and those charged with him, I testified under oath that I was an eyewitness to Alfred Cleveland, who I knew as Monday, along with people I knew as JR [i.e., Davis], Will and Shakeem beat Marsha

3

---

Blakely at Floyd Epps apartment in Lorain, Ohio and then murdered her behind Charlie's bar in Lorain. All of this was a lie. I never witnessed the murder of Marsha Blakely, was not with her or Alfred Cleveland the night she was murdered. This was a story my father told me to tell.

\* \* \*

I first heard of the murder of Marsha Blakely while at my then girlfriend Patricia Gaddy'[s] apartment in the Projects. A woman came to the house and said Marsha's body was found. I did not know who had done this, did not know anyone who was involved.

I then went to Charlotte Watkins' house who was also a girlfriend of mine in the early morning. My Dad came over to Charlotte's house and told me Marsha was dead and they were going to kill me too. He said he would tell me how you can get out of all this. He told me that I could say I was a witness. He pulled out some crack and we smoked. He then told me I had to memorize a story. This continued throughout the day and into the next. The story he told me to tell was that Al Monday came to get money, that Al said to go with him, that we went in car together to Floyd Epps, that the rest were there (Will, [Davis], Shakeem). He said to say that Al wanted me to beat Marsha up and then did.

I have never been in a car with Monday, that night or any time.

\* \* \*

My Dad set up a meeting with police. He was present during the interview. They showed me pictures of an apartment which they said was Floyd Epps' and asked me to describe what happened in the apartment. I then made up the story of what happened in the apartment, based upon the pictures.

(Aff. Doc. 12-3) Avery then states he told his father that "this was wrong," but his father "said I had to go to the police and continue to tell this story or he would kill me, my son, and Charlotte, if I told anyone about his plan. I believed him." Additionally,

I told Prosecutor Rosenbaum that I was lying for the money. We were alone in a room at the courthouse. He got very upset at me and scared

4

procured by Alfred Cleveland. Petitioner claimed he was unaware of, and had not received copies of, either the Jail Investigation Reports or Avery's 2006 affidavit until November 2011, when he obtained them from Alfred Cleveland- who had also been convicted in the murder.  The motion was denied and affirmed on appeal wherein it was held that petitioner failed to show that he filed his motion within a reasonable time after obtaining the newly discovered evidence.

Alfred Cleveland had filed a habeas petition in 2010 which was dismissed as untimely but reversed by the Sixth Circuit due to a credible claim of actual innocence based on the recanting Avery affidavit.  Upon remand, United States District Judge Zouhary held an evidentiary hearing.  He then denied the petition.  The Sixth Circuit denied a certificate of appealabilty.

In August 2013, petitioner herein filed an application in the Sixth Circuit to file a

---

me. He told me that if these dudes don't go down for his, that I would. When I then asked him for the $10,000, he got more upset. I later that day testified that I had lied for the money. This was true (and also because my Dad had threatened me which I did not mention in my testimony). I was then charged with perjury, although it was true that I lied for the money and because I was afraid. I was afraid at the time because of what my Dad told me of how these New York guys would be after me – or he would be.

***

Last year in the Summer, 2005, my father approached me to go to a doctor to sell my medical card and in the process help my father's efforts as an informant with the FBI in Detroit.  I thought this might be my way out from under all this. I went to the FBI and told them about the murder and my false testimony against Monday in Lorain. The agents said they would check it out and get back to me.  I never heard from them again...

5

successive habeas petition based on the same evidence he presented to the state courts.  The

Sixth Circuit rejected reliance on the phone bill, but

> As to his claims stemming from Avery's alleged perjury, however, Davis has made the required prima facie showing. If it were proven that Avery fabricated his testimony, that he was pressured by the prosecution to testify falsely at trial, and that the prosecution withheld evidence casting further doubt on Avery's credibility, Davis could establish that a constitutional violation occurred and that, absent this violation, no reasonable factfinder would have found him guilty.

In accordance with that order, the Sixth Circuit granted the application and transferred the

case to the district court.  Petitioner thereafter filed this Petition on November 19, 2014,

asserting seven grounds for relief:

> 1.  The state presented testimony at Mr. Davis' trial that it knew or should have known was false, in violation of Mr. Davis' due process rights.

> 2. The state violated Mr. Davis' due process rights when it failed to disclose evidence that impeaches the sole witness linking Mr. Davis to the murder, William Avery, Jr.

> 3. The state violated Mr. Davis' due process rights when it failed to disclose favorable evidence, specifically the statement of Jeremiah Abdullah.

> 4. The state violated Mr. Davis' due process rights when it failed to disclose exculpatory evidence, the cumulative effect of which would have produced a different result in Mr. Davis' trial.

> 5. Mr. Davis was denied the effective assistance of counsel, in violation of his rights under the United States Constitution, when counsel failed to present evidence corroborating Mr. Davis' innocence.

> 6. Mr. Davis' conviction is not supported by sufficient evidence, in violation of the United States Constitution.

> 7. Mr. Davis is actually innocent of Marsha Blakely's murder and felonious assault. His convictions violate the U.S. Constitution.

**Discussion**

Recognizing that the Sixth Circuit permitted the successive petition as to the claim

"stemming from Avery's alleged perjury" only, the Magistrate Judge reiterated that while petitioner had made a prima facie showing to obtain such authorization, he is required in the district court to satisfy the two-pronged standard under § 2244(b): First, petitioner must show that the factual predicate for his claim could not have been discovered previously through the exercise of due diligence.  Second, petitioner must show that the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found petitioner guilty of the underlying offense.

The Magistrate Judge determined that only Grounds One, Two, and Four, which relate to Avery's alleged perjury, were authorized by the Sixth Circuit.  As to Ground Seven, which asserts actual innocence, the Magistrate Judge recommended dismissal based on the law that free-standing actual innocence claims are non-cognizable in federal habeas proceedings. The Magistrate Judge determined that Grounds Three and Six should be dismissed because petitioner did not obtain permission from the Sixth Circuit to file a successive petition as to these claims which were previously presented in the prior habeas petition and dismissed as untimely. Finally, the Magistrate Judge recommended that Ground Five, the ineffective assistance of trial counsel claim, should be dismissed because it was not authorized by the Sixth Circuit and, in fact, was not raised in his application to that court.

Accordingly, the Magistrate Judge proceeded to an analysis of Grounds One, Two, and Four.  In Ground One, petitioner asserts that Avery's 2006 recantation affidavit demonstrates that Avery's trial testimony was false and that Avery told prosecutor Jonathan Rosenbaum he was lying for the reward money. Rosenbaum nevertheless pressured him to

7

testify falsely at petitioner's trial.  In Ground Two, a *Brady* claim, petitioner asserts that the State failed to disclose the Jail Investigation Reports which petitioner claims undermined Avery's credibility and proved that his testimony at trial was false. Ground Four asserts a cumulative *Brady* claim based on the State's alleged failure to disclose Avery's statement to the prosecutor that he was lying for the money and the Jail Investigation Reports.

After a thorough analysis, the Magistrate Judge concluded that petitioner could not satisfy the second prong (which is determinative of the two-pronged inquiry) of § 2244(b), set forth above, as to these claims- namely, the facts if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found petitioner guilty of the underlying offense.

Additionally, even assuming he had demonstrated that these grounds meet the statutory requirements, the Magistrate Judge found them to be untimely.  Specifically, petitioner acknowledged that the statute of limitations began to run on November 30, 2011 when he discovered Avery's recantation and the Jail Investigation Reports. The state court motion for leave to file a delayed motion for new trial did not statutorily toll the period because that motion was not "properly filed" given that it was dismissed in the state court as untimely. Because the statute of limitations expired on November 30, 2012, petitioner's August 22, 2013 application to the Sixth Circuit to file a successive petition was untimely. Nor would petitioner be entitled to equitable tolling as he did not diligently pursue his rights given that he waited seven months to file his June 2012 motion for leave to file his delayed motion for new trial after discovering the Avery affidavit and Jail Investigation Reports.

8

Finally, petitioner did not meet the actual innocence exception to the statute of limitation requirements given the Magistrate Judge's earlier discussion as to these grounds which found that the Avery affidavit was neither reliable nor trustworthy, and the Jail Investigation Reports did not undermine Avery's credibility.

Alternatively, the Magistrate Judge concluded that Grounds One, Two, and Four were procedurally defaulted because the state courts determined that petitioner's delayed motion for new trial was untimely. Nor could petitioner demonstrate cause and prejudice for the default. Particularly with regard to prejudice, the Magistrate Judge reiterated the finding that the Avery affidavit was neither reliable nor trustworthy, and the Jail Investigation Reports did not undermine Avery's credibility.

For all these reasons, the Magistrate Judge recommended that the successive Petition be denied. Petitioner filed objections enumerating 15 specific bases.  Respondent did not file a response to the objections.

First, petitioner asserts that the Magistrate Judge erred in relying on the evidence and testimony adduced at the *Cleveland* hearing before Judge Zouhary which was not part of the evidence presented at the herein trial or part of the erroneously excluded evidence.

The Magistrate Judge recognized that in deciding whether § 2244(b) is satisfied (i.e., no reasonable factfinder would have found petitioner guilty), the court considers the trial evidence and "adds back" the evidence kept from the jury. In a separate Order, the Magistrate Judge had expanded the record to include the transcript and exhibits of the evidentiary hearing from *Cleveland v. Bradshaw* before Judge Zouhary. As the *Cleveland* hearing was not within the parameters of evidence to be considered, petitioner contends that the Magistrate

9

Judge's "heavy" reliance on it was erroneous.  This Court disagrees.  The Magistrate Judge first addressed the evidence introduced at petitioner's trial, recounting the testimony of Pathologist Buchanan, Lorain Police Detective Taliano, Delphenia Gucie (who dated Lenworth Edwards), Avery, Florence Brooks (petitioner's girlfriend at the time), and petitioner. The Magistrate Judge next addressed the "added back" evidence consisting of the 2006 Avery recantation affidavit and the Jail Investigation Reports. She addressed the contents of the affidavit and noted Judge Zouhary's discussion as to how the affidavit came about. The Magistrate Judge also noted that petitioner had introduced an affidavit from an FBI agent regarding his meeting with Avery which was also part of the *Cleveland* record. The Magistrate Judge performed an analysis.  She determined that the 2006 affidavit would not have changed the outcome based on her own review of the trial transcript which showed that Avery's credibility was already at issue and that Avery's initial statement to the detectives was corroborated by physical evidence in the record identified by Detective Taliano.  The Magistrate Judge also made her own determination that the affidavit was suspect, as discussed below.  Likewise, the Magistrate Judge looked at the Jail Investigation Reports and found that they did not undermine Avery's testimony. The Court disagrees with petitioner that the Magistrate Judge heavily relied on Judge Zouhary's hearing in rejecting the merits of Grounds One, Two, and Four.[6]

---

[6]  At her conclusion, the Magistrate Judge included two footnotes which discussed the *Cleveland* hearing, but do not show that she relied heavily on it when reaching her decision.  The first acknowledged Judge Zouhary's opinion as to the non-importance of the Abdullah statement which statement the Magistrate Judge did not consider because it was not presented in the successive petition to the Sixth Circuit.  The next footnote recognized that while the Sixth Circuit in *Cleveland* initially found the Avery affidavit to be new, reliable evidence, Judge Zouhary

Second, petitioner asserts the Magistrate Judge should have allowed petitioner's discovery but instead relied on the evidence that the Sixth Circuit had already determined had formed the prima facie showing.

Subsequent to the filing of these objections, this Court declined to set aside, as clearly erroneous, the Magistrate Judge's Order denying petitioner's discovery.  Petitioner maintains that the Magistrate Judge has now denied the Petition on the very evidence that the Sixth Circuit already determined formed a prima facie showing.  The Sixth Circuit stated in its order allowing this successive petition, "Prima facie in this context means... sufficient allegations of fact together with some documentation that would warrant a fuller exploration in the district court."  *In re Ian R. Davis, aka Benson Davis,* No. 13-3981 (6th Cir. May 5, 2014) (citations omitted).  Petitioner contends that the Magistrate Judge failed to conduct "further exploration."  But, the Magistrate Judge did analyze the entire record in determining that the 2006 affidavit and Jail Investigation Reports would not have changed the outcome of the trial.  Thus, this objection is overruled.

Third, petitioner asserts the Magistrate Judge erroneously relied on Detective Taliano's testimony that Avery's initial statement was supported by physical and corroborating evidence.

The Magistrate Judge concluded that had Avery changed his story yet again and testified consistent with his 2006 recantation affidavit during petitioner's trial, the additional evidence would not have been sufficient to cause the jury to find him not guilty given Avery's history of recanting, the inherent suspiciousness of recantation testimony in general, and the

then found it to be unreliable and the Sixth Circuit did not issue a COA.

11

fact that Detective Taliano testified that he found Avery's September 11, 1991 initial eyewitness account (the initial interview) credible because it was consistent with other information the detectives had collected that Avery "couldn't possibly have gotten from either the street or any reports that may or may not have been in the papers."  Petitioner takes issue with the latter and points to corroborating physical evidence discussed by the Magistrate Judge that Taliano testified to and which petitioner contends was not supported by the record.

First, Detective Taliano testified that the numerous cuts to Blakely's body were consistent with Avery's eyewitness account of her murder. Petitioner points out that Avery did not state in his first or second police interviews that Blakely had been stabbed. It was not until the third police interview on January 23, 1992, that Avery stated that he saw the assailants stab Blakely.  This interview occurred after the 1991 mistrial in Edwards' case, and the coroner had testified before the mistrial was declared. Petitioner also points out that the detectives asked Avery early in his initial interview whether he had seen anybody with a knife and he responded that he had not. However, the Court notes that when asked again later in the initial interview whether he saw any knives, Avery responded, "No, I didn't see none. I didn't see the actual, I was shocked to hear that they found her like that."(Doc. 12-8 at 31) Thus, it seems Avery knew prior to Edwards's trial that Blakely had been stabbed.

Second, Detective Taliano testified that Avery had stated that Blakely struck Lenworth Edwards in the face during the struggle in Epps's apartment, and Edwards had covered his face and backed off. This was consistent with the fact that the blood found on a jacket provided by Delphenia Guice matched Edwards's and the angle of the blood was consistent with a nosebleed. But, petitioner points to Taliano's testimony at trial that the

12

police knew about Edwards's blood before Avery's initial interview.  Petitioner also maintains that the transcript of Avery's initial interview shows that he did not mention Blakely hitting Edwards until after the police turned off the recording device and turned it back on. Additionally, during his second police interview, Avery claims to have observed a chain Edwards was wearing but did not notice whether or not there was blood on his clothes. And, during Taliano's testimony before Judge Zouhary, he stated that no blood was found in Epps's apartment.

The Court disagrees with petitioner's supposition and finds it speculative to assume that the police, who knew Edwards's blood was on the jacket, gave Avery this information or told him to state that Blakely struck Edwards in the face. In fact, the transcript shows that Avery was already supplying this information before the machine was turned off. Petitioner relies on the fact that early in the interview, Avery said that Blakely was "fighting back," and when asked how she was fighting back, he responded, "Scratching, whatever she could do." (Doc. 12-8 at 3) Later, in the interview, immediately after the recording machine seemed to have been "shut off and then turned back on," Avery said that Blakely hit Edwards "some kind of way and [he] was out of it.  Out of the picture for a minute." When asked how she hit him, he described it was "hard enough to knock him back " and possibly "busted his nose." He said that he did not notice whether or not Edwards was bleeding.  (Doc. 12-8 at 25-26) Just prior to the machine being turned off, however, Avery was talking about how they were "all struggling", "fighting," and "Marcia just screaming, I don't know what she was saying, I couldn't understand what she was saying." He then states that "one of them, Will, [Lenworth Edwards's nickname] he fell somewhere over here. He fell somewhere because he didn't get,

13

he, he, he stalled for a minute cause I think he got..." (*Id.* 24-25) Avery was interrupted when the detective said that he was going downstairs to "get that picture." Avery resumed to state how he had walked into the apartment and "after everything got started and they got to fighting and stuff, they ended up over here. (Sounds like drawing)" An unidentified party then says something about a "bag of pictures" and the machine is turned off. When the interview resumes, Avery states, "About here, she hit Will some kind of way and Will was out of it. Out of the picture for a minute." (*Id.*) It seems clear to the Court that before the machine was turned off, Avery was already describing how Edwards fell "because I think he got..."  When Avery resumed talking, he continued explaining where "they ended up" and how Blakely hit Edwards and took him "out of the picture for a minute."

Third, Detective Taliano testified that his investigation revealed that the four assailants identified by Avery immediately attempted to leave town after the body was discovered. But, Taliano's testimony shows that only Lenworth and John attempted to do so. The Court does not find this to be a significant basis to undermine the corroborating evidence discussed herein.

In addition to the above corroborating evidence, the Magistrate Judge also relied on Taliano's testimony that Avery's statement that Blakely was dragged through a grassy, leaf covered area was consistent with the fact that a piece of leaf or grassy substance was found on her body. Petitioner does not counter this point. Avery's initial statement repeatedly described that Blakely was dragged, unconscious, out of one of the doors of the apartment to a car.  The detective, drawing a picture, had Avery describe exactly which door and where the car was parked.  (Doc. 12-8)   Although Avery's statement does not describe the area as grassy or

14

leafy, Detective Taliano would have known exactly, based on Avery's description, where Blakely was dragged.  When asked at petitioner's trial, "Is there a grassy or leafy area outside the door on the Reeves Avenue door of the Floyd Epps's apartment that she could have been dragged through if William Avery, Jr. was telling the telling the truth?" the detective answered, "Yes." (Doc. 12-6 at 280) Thus, this evidence was also corroborating.

The Court finds this objection to be without merit.

Regarding the fourth objection, petitioner asserts that the Magistrate Judge was wrong to dismiss petitioner's argument regarding an overturned table in Epps's apartment as immaterial where it did not corroborate Avery's story. Petitioner argues that while Taliano relied on Avery's claim that he observed a table knocked over during an altercation in the apartment as proof of Avery's credibility, the transcript of the first police interview shows that Taliano actually suggested it to Avery. The Magistrate Judge found the issue to be immaterial.  However, she pointed to evidence which showed that other individuals entered the apartment during the early morning hours after the murder and one individual observed the table laying on its side as described by Avery. The Magistrate Judge also noted that the other corroborating evidence, discussed above, was sufficient to support Avery's trial testimony. The Court rejects this objection.

In the fifth objection, petitioner asserts that the Magistrate Judge found petitioner's argument that information was provided to Avery by police to be speculative even though it was supported by evidence in the record. The Magistrate Judge recognized in a footnote that petitioner had argued in his Traverse that the police could have provided Avery with information prior to his initial statement, but she concluded that the argument was speculative

15

in the absence of evidence.  (Doc. 43 at fn. 20) The Court agrees with the Magistrate Judge.

In his Traverse, petitioner also refers to the transcript of Avery's initial statement wherein the police reference a "bag of pictures."  Petitioner asserts that the Magistrate Judge ignored this evidence but relied on Taliano's testimony from the *Cleveland* hearing that he did not take pictures of the Epps's apartment until after the initial interview.  For the following reasons, the Court finds petitioner's discussion regarding the pictures unpersuasive.

The Magistrate Judge found Avery's 2006 recantation affidavit to be suspect given that he stated therein, "[The police] showed me pictures of an apartment which they said was Floyd Epps' and asked me to describe what happened in the apartment. I then made up the story of what happened in the apartment, based upon the pictures."  (Doc. 12-3 Avery aff.) He had also stated elsewhere in the affidavit that he had never been to Epps's apartment. (*Id.*) But, the Magistrate Judge pointed out that Taliano testified at petitioner's 1994 trial that because Epps's body was also found and because he and Blakely were friends, the detectives went to Epps's apartment on August 8 to look around and secure the apartment. He returned on September 18 to photograph the apartment after learning during Avery's September 11 interview that it was a crime scene as Blakely had been assaulted there. (Tr. transcript at 255-257, 289-291) Taliano likewise testified at the *Cleveland* hearing that "September 11 was the first time we talked with William Avery, Jr. and it was not until the 18th of September that we photographed the interior of William Epps' apartment on Sunset Boulevard." (Doc 12-4 at 258)

Petitioner maintains that the Magistrate Judge ignored the transcript of Avery's initial interview with police and simply accepted Taliano's testimony from the *Cleveland* hearing

because the transcript of the interview refers to "pictures" and a "bag of pictures" which were "downstairs." Also, it appears as if, during the interview, Avery is pointing to locations in the apartment ("over here, by this bed," and "they ended up over here" and "there's Al standing right here, I was standing right here by the window looking out").  (Doc. 12-8)

Petitioner's contentions are not convincing. First, as demonstrated above, the Magistrate Judge did not just rely on Taliano's testimony from the *Cleveland* hearing, but also cited his trial testimony.  At petitioner's trial, the detective would not have had a reason, at that time, to conceal whether he had taken pictures earlier than September 18. Second, the transcript of the initial interview shows that Avery was asked to say in his own words what information he had. Avery described how he and the named assailants went to Floyd Epps's apartment. When they arrived, Blakely and a man "he didn't know" were in the apartment. For the reasons described, they started beating Blakely, she fought back, they knocked her out, and they dragged her out of the apartment to waiting parked cars. There was no indication at that point that Avery had been shown any pictures. In fact, at one point the transcript states, "sounds as if looking at map" and at other points "sounds as if drawing something." The detective also stated, "I'm gonna draw something here" when describing which streets abutted the apartment. Further on in the interview, the detectives also refer to possible pictures of the other assailants.[7] Later, and not until page 25 of the 33 page interview, the detectives refer to the bag of pictures downstairs. On the basis of the transcript, the Court

---

[7]     The detectives asked Avery if they showed him a picture of "Will" would he recognize him. Avery said, "Yeah." And, Avery states as to the "unknown guy," "If I seen his picture I'd know him." The detectives respond, "(Inaudible) before we leave we will."

cannot agree that the detectives showed Avery pictures of the apartment before he told his story. Accordingly, the Court agrees with the Magistrate Judge that Avery's averment that he fabricated the story based on the pictures to be suspect.  This objection is overruled.

Sixth, the petitioner asserts that the Magistrate Judge wrongly concluded that Avery's 2006 recantation affidavit was unreliable when, in fact, it was more trustworthy than the trial testimony.

The Magistrate Judge found the recantation affidavit to be unreliable given Avery's history of recanting, the inherent suspiciousness of recantation testimony generally, the corroborating physical evidence to Avery's initial statement, and the fact that Avery said in the affidavit that he made up a story based on the pictures shown him but Taliano testified that he did not take pictures until after that interview.

Petitioner characterizes as "overly simplistic" the Magistrate Judge's assessment that had Avery changed his mind yet again and testified consistent with the 2006 affidavit during the trial, the jury would only have been presented with more evidence of his tendency to change his story.  The Magistrate Judge noted that

> the jury in Davis' trial was presented with a plethora of evidence regarding Avery's credibility. Both Detective Taliano and Avery testified at length regarding Avery's recantation during Lenworth Edwards' first trial after the State refused to pay Avery an additional $10,000 to testify. The jury was also presented with evidence that Avery then changed his mind again, and testified at Lenworth Edwards' second trial that he lied when he recanted during Edwards' first trial and did, in fact, witness Blakely's assault and murder. Defense counsel attacked Avery's credibility repeatedly through Davis' trial, eliciting testimony regarding Avery's changing story, the reward money he collected, and his history of drug dealing. Based on its own thorough review of Davis' trial transcript, the Court can say with certainty that the jury heard a great deal of evidence and testimony regarding Avery's credibility and alleged lack thereof.

(Doc. 43 at 56-57)

18

Petitioner reiterates his argument that the physical evidence did not corroborate Avery's initial statement to the police. Additionally, petitioner points out that the Magistrate Judge did not consider the evidence that Avery was prepared to testify at Cleveland's state court post-conviction hearing but invoked his Fifth Amendment right to remain silent once immunity was denied and he was advised that he could be charged with perjury and go to prison for 30 years. He told a reporter after the hearing that Cleveland was innocent but that he should not have to go to prison for 30 years if he testified. (Doc. 1 Ex. 4) Finally, given that Avery's trial testimony was that of a paid informant and drug user who had been given information by the police and threatened by his father, the recantation is more reliable since Avery received no money for it, he went to the FBI on his own, he was now sober, and he was not influenced to make the statement.

For the reasons stated above, the Court agrees with the Magistrate Judge that there was corroborating physical evidence to Avery's initial interview with police and his affidavit was suspect given that the transcript of the interview does not show that Avery was provided pictures of the apartment. Given that the jury would hear his history of recantations, it cannot be said that no reasonable jury would find petitioner guilty if they also had the 2006 affidavit.

Seventh, petitioner asserts that the Magistrate Judge erred in concluding that the Jail Investigation Reports were consistent with Avery's testimony that Lenworth Edwards threatened him and the conduct was allowed by a corrections officer.

In Ground Two, petitioner asserts a *Brady* claim based on the State's alleged failure to disclose the Jail Investigation Reports which he claims undermined Avery's credibility and proved his testimony at trial was false. The reports were completed in 1991 while Avery was

19

held in the Lorain County jail on contempt charges during Lenworth Edwards's first trial. Avery had claimed that a corrections officer permitted Edwards to threaten Avery. At petitioner's trial, Avery testified that he had recanted in Edwards's first trial because Edwards threatened him. Petitioner now claims that the reports proved Avery fabricated his story and had not been threatened by Edwards, and so it did not explain why he recanted at Edwards's trial.  If petitioner had the report at trial, he could have used it to undermine Avery's credibility.

For the following reasons, the Court agrees with the Magistrate Judge.  She had noted that the petitioner had also argued that

> The report also demonstrates that, despite his testimony in Mr. Davis' trial, when Avery, Jr. recanted in Mr. Edwards' trial, he had no reason to do so. A jury, learning that Avery, Jr. had no external reason to recant, would have believed the recantation rather than his trial testimony, which was motivated by money and pressure from the prosecutor. Exhibit 1, p. 3-4. Avery, Jr.'s allegations against Mr. Edwards gave the jury the impression that Mr. Edwards, who testified in Mr. Davis' trial, was threatening and that he, and by association, Mr. Davis, had something to hide. Had the report been disclosed and Mr. Davis able to use it in his trial, it would have mitigated this negative inference made by the jury. Because Avery, Jr. was the entirety of the case against Mr. Davis, the report is material and there is a reasonable probability that, had it been disclosed, the result of Mr. Davis' trial would have been different.

(Doc. 43 at 35, citing Doc. 1 at 55-56)

Two documents were generated by the jail as a result of Avery's claim that he was threatened.  An incident report states that Avery told a Lorain patrolman that corrections officers brought Edwards (who was also incarcerated there) to Avery's (who was a witness against Edwards in his murder trial) cell and allowed him to threaten Avery. The log showed Edwards was not taken out of the housing area.  A hearing was held on Avery's allegedly

20

false statements about the corrections officer allowing the threat.  The hearing board issued a decision finding Avery guilty. But, the report described Avery's claim that an escorting officer had allowed Edwards to stand at Avery's cell door and make threats.  It also described that a corrections officer had also made a statement indicating that when Edwards was being escorted to court, he did say something to Avery who was standing in the window of his cell door.

The Magistrate Judge found that, even when considered in combination with the Avery affidavit, the Jail Investigation Reports do not support petitioner's argument because the jail reports do not undermine Avery's testimony that Edwards threatened him. At petitioner's trial, Avery testified that he encountered Edwards in the hallway before the holding cells and that Edwards made a motion like he was slitting his throat and pointed at Avery.  The Magistrate Judge determined this was not inconsistent with the reports which found that while being escorted, Edwards did say something to Avery at the door.  Even though the board concluded Avery falsely stated that a corrections officer allowed the threat, the factual basis of the jail reports was consistent with Avery's testimony at trial that Edwards threatened him.

Petitioner contends that it was erroneous and unreasonable for the Magistrate to speculate that although Avery was found guilty of lying about the corrections officer, he was truthful about Edwards threatening him.  The Court disagrees. The reports conclude that Avery was guilty of accusing a corrections officer of allowing him to be threatened.  But, the reports show that an encounter between the two inmates occurred where Edwards "said something" to Avery. Petitioner fails to demonstrate that the reports would have changed the

21

outcome of the trial.

Eighth, petitioner asserts that the Magistrate Judge should have considered the evidence cumulatively. Petitioner objects that the Magistrate Judge did not analyze what impact the 2006 affidavit and jail reports had on one another or would have had on the jury when considered together. Petitioner reasons that the jail reports show that Avery lied under oath and that his purported reasons for recanting during Edwards's trial were false. This shows that the 2006 recantation is more reliable than the trial testimony. When viewed together, the 2006 affidavit attests that Avery did not witness the murder and so with Edwards being innocent, petitioner asserts he would have been "substantially less likely" to have threatened Avery. Contrary to the Magistrate Judge's statement that the jury heard enough of Avery's credibility, if the jury additionally learned that Avery was not threatened by Edwards, lied under oath, testified because the prosecutor threatened him, and ultimately recanted without compensation or provocation, it would not find petitioner guilty.

Given the Court's previous findings regarding the recantation affidavit and jail reports, it disagrees that no reasonable factfinder would have found petitioner guilty had the documents been considered in conjunction with one another.

Ninth, petitioner asserts that the Magistrate Judge erroneously relied on Judge Zouhary's assessment of the witnesses' credibility in the *Cleveland* hearing. Requests by respondent to have this case and Alfred Cleveland's reviewed together have been denied[8] and

---

[8]     Judge Wells, who was originally assigned this case, denied respondent's motion to re-assign this case to Judge Zouhary as related to *Cleveland.* After Judge Wells's retirement and upon assignment to Judge Boyko, the respondent filed a motion for reconsideration which was also denied.

yet, the Magistrate Judge considered Judge Zouhary's assessment of the evidence and witness credibility in the *Cleveland* hearing when deciding the herein Petition. This was particularly troublesome where Judge Zouhary did not have all the relevant evidence before him, namely the jail reports, and petitioner did not have an opportunity to present argument or evidence or question witnesses.  This Court disagrees.

As discussed above, the Magistrate Judge did not unduly rely on that hearing. Additionally, petitioner notes that the Magistrate Judge discussed the *Cleveland* hearing in six footnotes: note 15 (Judge Zouhary described the circumstances regarding the origin of Avery's 2006 recantation affidavit.), note 17 (Judge Zouhary described a 2006 oral statement which Avery gave subsequent to his affidavit.), note 19 (Witness Guice had executed an affidavit in 2005 saying that her testimony in Cleveland's trial was coerced but Judge Zouhary found the statement to be wholly unreliable.), note 23 (The Magistrate Judge did not consider the Abdullah affidavit because the Sixth Circuit did not authorize it as a claim, but agreed with Judge Zouhary that it was not "particularly compelling."), note 24 (The Magistrate Judge recognized that Judge Zouhary found Avery's affidavit to not be reliable for a variety of reasons including the fact that the physical evidence corroborated Avery's trial testimony.), and note 25 ("[H]aving reviewed all the evidence including the transcript of the 2013 evidentiary hearing, [the Magistrate Judge] agrees with Judge Zouhary that Avery's 2006 recantation affidavit is not reliable.") The Court disagrees that these notes show that the Magistrate Judge improperly relied on Judge Zouhary's assessment of the evidence and witnesses or that petitioner was denied an independent review of his case.

Tenth, petitioner asserts that the Magistrate Judge erroneously inferred that the Sixth

Circuit's refusal to issue a COA (certificate of appealability) in Alfred Cleveland's appeal of Judge Zouhary's decision was actually an acknowledgment that Avery's recantation was unreliable. Rather, the Sixth Circuit found that Cleveland had not demonstrated that the prosecution knew that Avery's testimony was false at the time of trial. The Court finds that even if the Magistrate Judge did so infer, she made her own assessment of the affidavit and did not improperly rely on Judge Zouhary's conclusion.

In the eleventh and twelfth objections, petitioner asserts that the Magistrate Judge erred in concluding that the claims are time-barred and not statutorily or equitably tolled.

The Magistrate Judge determined that even had petitioner successfully demonstrated that Grounds One, Two and Four met the requirements of § 2244(b)(2)(B)(ii), the claims would be dismissed as untimely. The claims were filed beyond the one-year statute of limitations period set forth in the AEDPA and petitioner's motion for leave to file motion for new trial did not statutorily toll the limitations period.  She reasoned as follows. In his June 2012 motion for leave to file delayed motion for new trial, petitioner acknowledged that he first became aware of the 2006 affidavit and jail reports in November 2011 when he obtained them from Cleveland. Petitioner recognized in his Traverse that the limitations period began to run on November 30, 2011, after his discovery of the affidavit and reports. The motion for leave to file delayed motion for new trial was not "properly filed"so as to toll the limitations period because it was dismissed as untimely. The state appellate court determined that petitioner did not prove that he was unavoidably prevented from discovering the evidence in a timely manner and petitioner's seven month delay in filing the motion after discovering the evidence was not reasonable. The statute of limitations began to run on November 30, 2011

and expired on November 30, 2012. Petitioner's successive application to the Sixth Circuit was not filed until August 22, 2013.  Nor was petitioner entitled to equitable tolling given that petitioner did not diligently pursue his rights when he waited seven months in filing his state court motion after discovering the evidence.

Petitioner claims that the state court was wrong when it faulted him for not uncovering the evidence earlier which the state had suppressed. Petitioner makes the same argument that the Magistrate Judge rejected- that the Sixth Circuit concluded that Davis made a *prima facie* showing that he could not have discovered the new evidence previously through the exercise of due diligence. This Court agrees with the Magistrate Judge's conclusion that the Sixth Circuit's finding regarding diligence was made in the context of adjudicating petitioner's application to file a successive petition pursuant to § 2244(b)(2).

The Court finds this objection unpersuasive.

Thirteenth, petitioner asserts that the Magistrate Judge erred in finding that actual innocence did not toll the statute of limitations. Assuming his claims are time-barred, petitioner argues that they should still be considered because he is actually innocent.  The Magistrate Judge rejected this argument for the reasons stated previously, i.e., the 2006 affidavit is unreliable and untrustworthy and the Jail Investigation Reports do not undermine Avery's credibility. This Court agrees as stated herein.

Fourteenth, petitioner asserts that the Magistrate erred in finding Grounds One, Two and Four to be procedurally defaulted.

The Magistrate Judge found the first two prongs of the *Maupin* test for determining procedural default to be clearly satisfied because petitioner's delayed motion for new trial was

25

filed approximately 18 years after the verdict was rendered and, therefore, he failed to comply with Ohio Crim. R. 33(B) which requires that it be filed within 120 days. Additionally, the state appellate court clearly enforced Crim. R. 33(B), the state procedural sanction, and expressly found that petitioner's motion was untimely because he failed to demonstrate by clear and convincing evidence that he was unavoidably prevented from discovering the newly discovered evidence supporting his motion in a timely manner. The state appellate court also concluded petitioner did not meet the state's "reasonableness" requirement because he waited an additional seven months after discovering the new evidence to file his motion for leave to file delayed motion for new trial. The Ohio Supreme Court declined jurisdiction. The Magistrate Judge found the third *Maupin* prong to be satisfied based on other precedent in this district concluding that Crim. R. 33 constitutes an adequate and independent state law ground foreclosing federal habeas relief. The Magistrate Judge also rejected petitioner's argument that he could not have discovered the new evidence within 120 days of his conviction, agreeing with the prior precedent that "absent extreme circumstances where it appears that the state court's interpretation is an obvious subterfuge to evade consideration of a federal issue, this Court is bound by the state courts' definition of its own rules." (Doc. 43 at 80-81) Nor, assuming he established cause to excuse the default, could petitioner establish prejudice given the prior finding of the Magistrate Judge that the affidavit was neither reliable nor trustworthy and the jail reports did not undermine Avery's credibility.

Petitioner maintains that the state court erred in denying the delayed motion and Ohio does have a firmly established and regularly followed procedural rule governing the timeliness of delayed motions for new trial. The Court rejects petitioner's assertions for the

26

reasons stated by the Magistrate Judge.

Fifteenth, petitioner asserts that the Magistrate Judge's conclusion as to Grounds Three, Five, Six, and Seven was erroneous.

As stated earlier, the Magistrate Judge determined The Magistrate Judge determined that Grounds Three and Six should be dismissed because petitioner did not obtain permission from the Sixth Circuit to file a successive petition as to these claims which were previously presented in the prior habeas petition and dismissed as untimely. Nor was Ground Five authorized by the Sixth Circuit and, in fact, was not raised in his application to that court. Finally, Ground Seven, a free-standing actual innocence claim, is non-cognizable in federal habeas proceedings.  The Court agrees.

For these reasons, the Court overrules petitioner's objections and accepts the Magistrate Judge's Report and Recommendation.  Additionally, it is incorporated herein by reference.

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation omitted).  The Court finds that reasonable jurists could debate its denial of habeas corpus relief on Ground One and grants a certificate of appealability as to this claim.

**Conclusion**

For the reasons set forth herein and for the reasons set forth in the Magistrate Judge's

Report and Recommendation which is incorporated herein by reference, the Petition for Writ

of Habeas Corpus is denied. Furthermore, the Court certifies that a COA is issued as to

Ground One.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan                            
PATRICIA A. GAUGHAN
United States District Judge

Dated: 2/15/17

28